STATE OF NORTH CAROLINA v. DANNY CHANCE

No. 78

(Filed 15 December 1971)

1. Constitutional Law § 29; Criminal Law § 135; Jury § 7— capital case — jury selection — challenge to veniremen who would never return death penalty

The defendant in a capital case cannot complain of the exclusion of those veniremen who stated unequivocally that they would automatically vote against the imposition of capital punishment without regard to any evidence that might develop in the trial.

2. Criminal Law § 89— credibility of witnesses — restrictions on attempts to discredit

The defendant in a capital case was not prejudiced when the trial court restricted his attempts to discredit the principal witnesses by showing inconsistencies in their testimony, where (1) the subject matter of the questions did not in itself tend to discredit the witnesses and (2) the purported inconsistencies were of little moment when considered in context with the facts of the case.

3. Criminal Law § 87— refreshing the recollection of a witness

The solicitor was properly allowed to refresh the recollection of his witness by asking the witness to read a written statement that the witness had given another person, and such action did not amount to an impeachment of the witness.

4. Criminal Law § 88— restrictions on cross-examination — attempt to discredit State's witness — offer of parole

Trial court properly sustained an objection to defense counsel's asking the State's witness whether or not he had been told by his attorney that he would probably get help on a parole if he testified for the State, especially since there was no evidence to indicate that the attorney was acting on behalf of the State with his promise of parole.

5. Criminal Law § 43— photographs of victim's body — admissibility

In a homicide and kidnapping prosecution, photographs of the victim's body, which were used by physicians to illustrate their testimony, held properly admitted in evidence.

**6. Criminal Law § 43— admissibility of photographs — requisites**

Ordinarily, a witness may use photographs to explain or illustrate anything which is competent for him to describe in words; if a photograph is relevant and material, the fact that it is gory or gruesome will not alone render it inadmissible.

**7. Criminal Law § 120— rape case — instruction on return of the death penalty**

In a prosecution charging defendant with rape, trial court's instruction to the jury, "You may find the defendant guilty of rape, as charged in the bill of indictment, and if you say no more, I will sentence him to die," *held* not prejudicial to the defendant.

**8. Constitutional Law § 29; Criminal Law § 135; Rape § 7— death penalty for rape — validity and constitutionality**

Imposition of the death penalty upon defendant's conviction of rape in 1971 was not rendered unconstitutional by the U. S. Supreme Court decisions of *U. S. v. Jackson*, 390 U.S. 570, and *Pope v. U. S.*, 393 U.S. 651.

**9. Criminal Law § 146— appellate review in capital case**

In capital cases the Supreme Court reviews the record and *ex mero motu* takes notice of prejudicial error.

**10. Criminal Law § 66— in-court identification of defendant — capital case — effect of police lineup in the absence of counsel**

A rape and kidnapping victim's in-court identification of defendant as the perpetrator of the crimes was properly admissible in evidence, notwithstanding the victim saw the defendant in a police identification lineup at a time when the defendant was without counsel and could not waive his statutory right to counsel, where the victim's in-court identification was clearly based upon her observation of the defendant during the commission of the crimes, which took place over a five or six hour period. G.S. 7A-451(b)(2) and G.S. 7A-457(a).

**11. Criminal Law § 75— admissibility of incriminating statements — capital case — absence of counsel — voluntariness of statements**

Defendant's statements implicating him in the crimes of kidnapping and murder were not rendered inadmissible on the ground that defendant had not been accorded his statutory right to counsel at the time the statements were made, where the statements were in fact volunteered by defendant and were not obtained by an in-custody interrogation. G.S. Ch. 7A, Art. 36.

**12. Criminal Law §§ 74, 75— what constitutes a confession — test of admissibility — accused who is in custody**

The extra-judicial statement of an accused is a confession if it admits that the defendant is guilty of the offense charged or of an essential part of the offense; the fact that such statement is made while the accused is in custody does not, in itself, render the confession incompetent.

APPEAL by defendant from *Bailey, J.,* at 29 March 1971 Session of CUMBERLAND Superior Court.

Defendant was charged in four separate bills of indictment, each proper in form, with the murder of James Earl Buckner, the rape of Gwen Davis, the kidnapping of James Earl Buckner, and the kidnapping of Gwen Davis. The cases were consolidated for trial, and defendant entered a plea of not guilty to the charge contained in each indictment.

During the selection of the jury, defendant excepted to the action of the trial judge in allowing challenges for cause as to five of the veniremen.

The following is a summary of the evidence offered by the State:

Gwen Davis testified that on 28 June 1970 she was fourteen years old. When asked if she had seen Danny Chance on 29 June 1970, defendant's counsel objected and requested a voir dire hearing. On voir dire, Gwen Davis testified to events which revealed that she was in the presence of defendant from about midnight on 28 June 1970 until about 5:30 a.m. on 29 June 1970; that during that time she was forcibly taken into an automobile driven by defendant, and for a period of about 35 to 45 minutes she sat in the front seat next to defendant; that she later saw him on the 29th day of June at the Sheriff's office in a lineup consisting of defendant and three other white males of about the same height; she identified Danny Chance immediately without any suggestion from anyone, and that her identification was based on having seen him during the period from 12 o'clock on June 28th to the early morning hours of June 29.

Louis Frye also testified in the absence of the jury and stated that on 29 June 1970 he was a deputy sheriff in Cumberland County, and that he saw defendant Chance at about 2:00 o'clock on 29 June; that before talking with him, he advised him of his "rights," and that at that time defendant read and signed a form which acknowledged that he had received warnings as required by *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602.

Still on voir dire, the witness related statements made by defendant. He stated that defendant also signed a consent to

allow search of his house and car. Defendant offered no evidence on voir dire. The trial judge thereupon found facts and concluded:

> "That the search of the suspect Chance's car and home was in every respect valid, was not induced by any fear of harm or hope of reward and that such statement as he gave to Detective Frye was purely voluntary and was given freely and voluntarily and understandingly and in full knowledge of his rights at a time when the defendant was not under the influence of alcohol or any other— or had any other apparent mental abnormality."

The trial judge also overruled both the objection as to the identification of defendant by the witness Davis and the objection to statements given to Mr. Frye by defendant.

The witness Davis then returned to the stand and testified: that on 28 June 1970, at about 3:00 o'clock p.m., she and a friend went to Steve's Drive-In in Fayetteville and remained there until about 11:00 o'clock p.m., when she departed with James Earl Buckner, aged 23. They drove directly to her home within a period of about eight to ten minutes. Buckner stopped his car about 30 yards from the front of her house, and she and Buckner were leaning against the car facing the road, engaged in conversation. At this point, a white 1961 or 1962 model Chevrolet station wagon, which was dented, rusty, and had one rear taillight broken out, passed, turned around and came back and parked behind Buckner's car. Four men emerged from the car and surrounded the witness and Buckner. These four men were Charles Wilcosky, David Sisneros, Andrew Strickland and the defendant Danny Chance. She had never seen any of these men before that night. Strickland pulled out a pistol, stuck it in Buckner's ribs, and told both Buckner and Gwen to get into the station wagon. Buckner was forced into the back seat by Sisneros and Wilcosky, and she was placed in the front seat between the driver Chance and Strickland. Chance drove the automobile out on old 301 into the country, and while he was driving Strickland put his left arm around her shoulder and began to kiss her on her face and lips while trying to penetrate her privates with his hand. He forced her to remove her panties and handed the pistol to defendant Chance. Chance put the pistol between his leg and her leg and she grabbed the pistol and threw it out of the window. Strickland at that point

struck her. After driving several miles into the country, Chance drove the automobile into and snapped a cable stretched between two posts which blocked access to a "two-rut" road. He continued down the road and stopped the automobile between two ponds, where Sisneros and Wilcosky took Buckner out of the automobile. Chance got out of the automobile, and Strickland put her into the back seat, where he forced her to commit a crime against nature and then forcibly had intercourse with her. She stated that she did not consent to any of these acts. Strickland left the automobile and Chance got into the back seat and ripped off her remaining clothes. He then forced her to commit a crime against nature with him and forced her against her will to have intercourse with him.

Sisneros and Wilcosky, in turn, entered the car and forced her to commit sexual acts with each of them. While Wilcosky, the last of the four to assault her, was in the back seat, the others returned to the car and Chance drove the car back through the broken cables, down a dirt road into a tobacco field. There Strickland and Chance go into the back seat with her and further assaulted her. Thereafter, her clothes were returned and somebody began to choke her. The next thing she remembered was waking up in the sunshine lying on two small boards placed across a ditch. She walked to a house belonging to Harold Eldridge, who carried her to her home in Fayetteville. Her mother immediately called the Sheriff's office and Detective Frye answered the call. Gwen showed Detective Frye the route taken the previous night, and they located the body of James Earl Buckner. Later, at the courthouse, she identified a station wagon as the one used the night before, and identified as hers an earring which was shown to her by Major Kiser of the Fayetteville Police Department.

Detective Frye of the Fayetteville Police Department then testified that in response to a call he went to the home of Gwen Davis on the morning of 29 June 1970. He found her badly bruised about the face, neck and shoulders, and apparently in a daze. She told him briefly what had happened, and he went to the place where Buckner's car was parked and observed tracks nearby made by "mud-grip" tires. Gwen Davis was able, with great difficulty, to show him where she had been taken. They found the road leading into the woods and he observed a snapped cable and a place where an automobile had left tracks

made by "mud grip" tires. They drove down the road to a point beyond two gravel pits, where he found a scarred pine tree, and observed that the grass around the base of the tree had been "trampled down." He followed the drag mark into the bushes and discovered the dead body of a man which Gwen Davis identified as the body of James Earl Buckner. Buckner's hands were tied together and his face and neck were badly bruised and swollen. (Detective Frye used photographs of the body to illustrate his testimony at this point.) Frye and Gwen Davis returned to Fayetteville to look for the station wagon in which she had been abducted. He had broadcast a description of the station wagon earlier in the day, and when they returned to Fayetteville they found a station wagon matching the description given him by Gwen Davis parked behind the courthouse. He went into the Sheriff's office and there found Major Kiser of the Sheriff's Department and Danny Chance. Chance consented to a search of the car, and Major Kiser found an earring in the back seat which was identified by Gwen Davis as one belonging to her which she had worn on the previous night.

Frye testified concerning certain questions asked by defendant and statements made by him.

David Sisneros testified that he and Charles Wilcosky were members of the U. S. Army, stationed at Fort Bragg. He knew Strickland prior to 28 June 1970, but had never seen Chance until that evening. The four men met at the Drop Zone Club in Fayetteville and drank together until about midnight, at which time they bought a case of beer and rode around in Chance's automobile drinking the beer. It was at Strickland's suggestion that they stopped and abducted Gwen Davis and Buckner. He testified that Chance drove the station wagon into the woods and stopped, and that he and Wilcosky forcecd Buckner out of the back seat. Chance suggested that they tie Buckner to a tree and gave Sisneros a piece of rope. After tying Buckner to the tree, Chance, Sisneros and Wilcosky stood around for Strickland to get out of the car. They observed Strickland having intercourse with Gwen Davis in the back of the station wagon. Chance then entered the car and Strickland went over to the tree where Buckner was tied. Strickland tied Buckner tightly to the tree, winding the rope around his neck. Chance got out of the car and Sisneros got into it, and had sexual relations

with Gwen Davis. When Sisneros got out of the car, Buckner was no longer tied to the tree. He did not see Buckner anywhere. After refreshing his memory from a written statement, handed him by the Solicitor, Sisneros stated that Strickland or Chance told him they had killed Buckner and put him in the bushes. Sisneros did not remember which of the two made the statement. After that, Sisneros, Strickland and Chance got in the car, and Chance drove to a tobacco field and parked. When Wilcosky got out of the back seat, Chance and Strickland got in the back seat and again assaulted Gwen Davis. Someone gave Gwen Davis her clothes and as she was dressing, Strickland told Sisneros and Wilcosky, "We have already killed the guy, and it's your chance to kill the girl." Wilcosky and Sisneros did not kill the girl and Strickland reached back and hit her in the throat and proceeded to choke her until she passed out. Chance, Sisneros and Wilcosky placed her on Strickland's shoulder and he headed into the woods. At one point, when she appeared to regain consciousness, Strickland dropped her on her head and stated that he thought her neck was broken. Chance asked if Gwen were dead, and thereupon walked up and "stomped on her neck . . . for 30 to 45 seconds." Strickland put his weight on Chance's shoulders and "Chance stood on Gwen Davis' throat no more than ten or fifteen seconds." Gwen did not move, and they put her in some bushes and left.

The State offered medical testimony showing that Gwen Davis had been badly bruised around the head and shoulders and that she was bruised around the pelvic area; her female organ had been penetrated by a male organ. The pathologist who performed an autopsy on Buckner stated that he had died of ligature strangulation, and that he had been badly beaten around the head, neck, shoulders, arms and groin.

Defendant offered testimony of an acquaintance and a minister to the effect that he bore a good reputation.

The jury returned a verdict of guilty to the charge of rape with no recommendation, a verdict of guilty of murder with recommendation of life imprisonment, a verdict of guilty of kidnapping James Earl Buckner and a verdict of guilty of kidnapping Gwen Davis. On the rape charge Judge Bailey pronounced the mandatory sentence of death by asphyxiation. On the murder charge he pronounced a sentence of life imprisonment, and on the verdict of guilty of kidnapping James Buckner

a sentence of 99 years in prison, and on the verdict of kidnapping Gwen Davis, a sentence of 99 years in prison. It was adjudged that the death sentence be first imposed and that the other sentences run consecutively.

Defendant gave notice of appeal in open court, and the court appointed Sol G. Cherry, the Public Defender, to represent defendant on his appeal.

*Attorney General Morgan and Assistant Attorney General Rich for the State.*

*Sol G. Cherry, Public Defender, Twelfth Judicial District, and William S. Geimer, Assistant Public Defender, for the defendant.*

BRANCH, Justice.

[1] By his first assignment of error, based on Exceptions 2, 3, 4 and 5, defendant contends that the jury's selection in the present case violated the mandate of *Witherspoon v. Illinois,* 391 U.S. 510, 20 L. Ed. 2d 776, 88 S.Ct. 1770.

Each of the challenged veniremen stated unequivocally that he or she would automatically vote against the imposition of capital punishment without regard to any evidence that might develop in the trial.

In Footnote 21 of *Witherspoon v. Illinois, supra,* it is stated:

"We repeat, however, that nothing we say today bears upon the power of a State to execute a defendant sentenced to death by a jury from which the only veniremen who were in fact excluded for cause were those who made unmistakeably clear (1) *that they would automatically vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them,* or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt."* (Emphasis added.)

The examination which is fully set out in the record clearly shows that each of the challenged jurors would not return a verdict that would result in the imposition of the death sentence. We hold that the jury selection in the present case did not

violate the mandate of *Witherspoon. State v. Westbrook,* 279 N.C. 18, 181 S.E. 2d 572; *State v. Miller,* 276 N.C. 681, 174 S.E. 2d 481; *State v. Sanders,* 276 N.C. 598, 174 S.E. 2d 487; *State v. Atkinson,* 275 N.C. 288, 167 S.E. 2d 241.

**[2]** Defendant assigns as error the action of the trial judge in restricting defendant counsel's cross-examination.

Defendant's counsel asked the witness Gwen Davis:

Q. Now, Miss, did you not make a statement to Mr. Gerald Cannon (?) in Lillington, and at that time you told him that you had dated Buckner?

The trial judge sustained the State's objection.

Again on cross-examination of the witness Gwen Davis, the following occurred:

"I don't remember who was in the car when I heard something like someone hit Buckner.

Q. Is that what you testified to in the Wilcosky and Sisneros trial?

Objection by State

Court: Sustained.

EXCEPTION      EXCEPTION No. 10."

Later, the witness Louis W. Frye was asked:

"Q. Well, didn't you say on direct examination that she said Buckner was her boyfriend?

A. She said a friend, that had brought her home.

Q. Didn't you testify to that, Mr. Frye?

Objection by State.

Court: Sustained.

EXCEPTION      EXCEPTION No. 11."

The applicable law permits joint consideration of these several rulings.

It is true that a witness may be impeached by proof of prior inconsistent statements. *State v. Britt,* 225 N.C. 364, 34

S.E. 2d 408. However, "The limits of legitimate cross-examination are largely within the discretion of the trial judge, and his ruling thereon will not be held for error in the absence of showing that the verdict was improperly influenced thereby." The above statement was quoted with approval in *State v. McPherson*, 276 N.C. 482, 172 S.E. 2d 50.

This record does not show what the witness would have said had he or she been allowed to answer, and a denial would have been binding on the cross-examiner since the matter inquired into was obviously collateral. Stansbury, N. C. Evidence, 2d Ed., § 48, p. 96. The subject matter of the questions addressed to the witness Davis and the witness Frye did not, in itself, tend to discredit either witness. Whether Gwen Davis had "dated" Buckner, or whether he was her friend or "boyfriend" or who was in the car when she heard something like someone hit Buckner, all seem to be of little moment when considered in context with the facts of this case. Even conceding technical error, defendant fails to show that the verdict was improperly influenced by these rulings.

This assignment of error is overruled.

[3] By his next assignment of error defendant contends that the trial judge erred by allowing the Solicitor to impeach his own witness, David Sisneros. This assignment of error is based on Exception No. 12, which points to the following portion of the record.

Q. I refer to the statement marked State Exhibit 12 and ask you, would you read it to yourself, the last paragraph, on page 2 and ask you if you can refresh your recollection from that?

Attorney Cherry: I object to this, he is trying to impeach his own witness.

Court: Well, I will let him read it to himself. Then you may read it. Then I will read it. It is hard to rule on it until I do.

QUESTIONS Continued by Solicitor Thompson:

Q. From reading and refreshing your recollection from this statement —

Attorney Cherry: Objection, your Honor.

Court: Overruled.

EXCEPTION      EXCEPTION NO. 12.

I now recall that Chance or Strickland told me that they had already killed him and put him in the bushes. I don't remember which one it was. Chance was present."

State's Exhibit 12 is identified on page 67 of the record as being the statement given to a Mr. Neal by the witness Sisneros.

Stansbury, N. C. Evidence, 2d Ed. § 32, p. 62, contains the following statement:

"A witness may be compelled, at the instance of a party who is examining or cross-examining him, to inspect a writing which is present in court, if it is in his handwriting or it otherwise appears that his memory may be refreshed by reading it."

In the case of *State v. Noland*, 204 N.C. 329, 168 S.E. 412, this Court, speaking through Adams, J., stated:

". . . The witness had made an affidavit as to facts which were material and upon his examination in this case was hesitant and evasive in his answers to questions asked him by the solicitor. The court gave the prosecuting officer leave to call the attention of the witness directly to the contents of his affidavit. The examination was not intended as an impeachment of the witness but as an effort to refresh his memory by reference to statements he had previously made and to prevent confusion or equivocation in his testimony. The trial court in the exercise of its discretion may under such circumstances permit a party to propound leading questions to his own witness."

The Judge correctly allowed the Solicitor to refresh the recollection of this witness, and such action did not amount to an impeachment of his own witness.

[4] Defense counsel asked witness Sisneros if his attorney, Mr. Allen Litch, did not tell him that he would probably get help on a parole if he, Sisneros, testified for the State. The trial judge sustained the State's objection.

It is recognized that it is proper on cross-examination to test a witness as to bias concerning a promise of or his just expectation of pardon or parole as the result of his testifying for the State. *State v. Roberson*, 215 N.C. 784, 3 S.E. 2d 277. However, this rule must be applied in connection with the equally well recognized rule that the legitimate bounds of cross-examination are largely within the discretion of the trial judge, so that his ruling will not be held as prejudicial error absent a showing that the verdict was improperly influenced thereby. *State v. McPherson, supra.*

Here the question was directed to a conversation with defendant's attorney. There is nothing to indicate that he was in any way connected with the State so as to be able to promise or deliver parole relief. Further, defendant by his question carried to the jury the full force and implication of his contention. The trial judge's ruling was within the extent of his authority, and defendant has failed to show prejudicial error resulting from this ruling.

By Assignment of Error No. 23 defendant contends that the trial judge erred by limiting his cross-examination of the witness Sisneros. Defendant seems to concede that this ruling was made in the exercise of the trial judge's discretion. We agree that this was a discretionary ruling and that no abuse of discretion is shown. *State v. McPherson, supra.* This assignment of error is overruled.

[5] Defendant next contends that the trial judge committed error by admitting into evidence photographs of the deceased Louis Buckner because they were inflammatory and served no useful purpose.

Defendant does not contend that the photographs are inaccurate, repetitious, or that they were not properly taken and authenticated.

[6] Ordinarily, a witness may use photographs to explain or illustrate anything which it is competent for him to describe in words, *State v. Atkinson, supra; State v. Gardner*, 228 N.C. 567, 46 S.E. 2d 824, and if a photograph is relevant and material, the fact that it is gory or gruesome will not alone render it inadmissible. *State v. Atkinson, supra; State v. Lentz*, 270 N.C. 122, 153 S.E. 2d 864; *State v. Porth*, 269 N.C. 329, 153 S.E. 2d 10;

*State v. Gardner, supra.* The photographs in this case were used by the physicians to illustrate and make their testimony more intelligible to the jury. They were admitted into evidence under a proper instruction limiting their use to illustration of the witnesses' testimony. The photographs were relevant, **properly** authenticated, served a useful purpose, and were properly admitted into evidence and viewed by the jury.

[7]   In his charge to the jury the trial judge stated, *inter alia,* "You may find the defendant, Danny Chance, guilty of rape, as charged in the bill of indictment, and if you say no more, I will sentence him to die." Defendants excepts and assigns as error this portion of the charge.

Defense counsel in his brief states: "It is recognized that the court considered somewhat stronger language by the same trial judge in *State v. Atkinson,* 278 N.C. 168, and found no error. For this reason, it would seem to be an exercise in futility to bring this particular question forward." We agree.

This portion of the charge does not constitute an expression of opinion by the trial judge which prejudiced this defendant in the eyes of the jury. *State v. Atkinson,* 278 N.C. 168, 179 S.E. 2d 410; *State v. Douglas,* 268 N.C. 267, 150 S.E. 2d 412. This assignment of error is overruled.

[8]   Finally, defendant, by Assignment of Error No. 32, contends that the death penalty imposed in the rape case constituted cruel and unusual punishment, prohibited by the United States Constitution and the Constitution of the State of North Carolina.

Defendant, in his brief, concedes that *State v. Atkinson, supra,* and the cases there cited, make his argument as to this assignment of error futile. However, he requests that we now consider the assignment of error in light of the memorandum decisions of the United States Supreme Court which reversed the death sentences imposed by the several superior courts, which were affirmed by this Court, in the cases of *Atkinson v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 859, 91 S. Ct. 2283 (1971); *Hill v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 860, 91 S. Ct. 2287 (1971); *Roseboro v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 860, 91 S. Ct. 2289 (1971); *Williams v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 860, 91 S. Ct. 2290 (1971); *Sanders v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 860, 91 S. Ct. 2290

(1971) ; *Atkinson v. North Carolina,* 403 U.S. 948, 29 L. Ed. 2d 861, 91 S. Ct. 2292 (1971).

This Court considered this question in light of these cases in a nearly identical factual situation, in the case of *State v. Doss, ante,* 413, 183 S.E. 2d 671. There the Court, speaking through Moore, Justice, said:

" . . . In the decisions entered by the Supreme Court of the United States, that Court as authority for its decision in each case cited *United States v. Jackson,* 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968), and *Pope v. United States,* 392 U.S. 651, 20 L. Ed. 2d 137, 88 S. Ct. 2145 (1968). Neither of these cases is controlling in the case at bar. Prior to the commission of the crime charged in this case and to the trial, G.S. 15-162.1 was repealed. Under that statute any person accused of first degree murder could have tendered in writing a plea of guilty of said crime, and the State with the approval of the court could have accepted such plea, in which case punishment was life imprisonment. G.S. 15-162.1 was similar to the Federal Kidnapping Act, 18 U.S.C. § 1201(a), the death penalty of which was condemned in *Jackson,* and the Federal Bank Robbery Act, 18 U.S.C. § 2113(e), the death penalty of which was condemned in *Pope.* With the repeal of G.S. 15-162.1, this infirmity insofar as the death penalty in the felony of murder in the first degree, or burglary in the first degree, or arson, or rape in North Carolina was removed."

G.S. 15-162.1 was repealed effective 25 March 1969. Its provisions were substantially re-enacted effective 15 June 1971. This re-enactment was repealed on 21 July 1971.

In instant case the crime was committed on 29 June 1970. The trial commenced on 29 March 1971 and final judgment was rendered in the Superior Court of Cumberland County on 31 March 1971. Since G.S. 15-162.1 had been repealed and had not been re-enacted when the crime in instant case was committed and judgment rendered, the infirmity as to the death penalty condemned in *Jackson* and *Pope* had been removed.

By authority of *State v. Doss, supra,* this assignment of error is overruled.

**[9]**  Defendant does not, by assignment of error,. attack his in-court identification or evidence as to proceedings at the lineup on the ground that he was without counsel when the lineup proceedings were conducted; neither does he contend that the court erred in admitting into evidence questions asked by him and statements made by him to Detective Frye in the absence of counsel. However, in capital cases we review the record and *ex mero motu* take notice of prejudicial error.

It should be noted in this case that the "lineup" was held on 29 June 1970 and the statements made by defendant to Detective Frye were made on the same date. There was no finding or evidence in the record relating to defendant's indigency on 29 June 1970. On 26 October 1970 Judge Thomas D. Cooper found defendant to be an indigent and appointed the Public Defender of the 12th Judicial District to represent him.

We first consider the pretrial identification procedures.

Since decision in *United States v. Wade,* 388 U.S. 218, 18 L. Ed. 2d 1149, 87 S. Ct. 1926, and *Gilbert v. California,* 388 U.S. 263, 18 L. Ed. 2d 1178, 87 S. Ct. 1951, on 12 June 1967, it has been established that an accused has a constitutional right to the presence of counsel at in-custody proceedings and, absent voluntary waiver, when counsel is not present any testimony by witnesses that they had identified the accused at a lineup is rendered incompetent and the in-court identification of an accused by a lineup witness is rendered inadmissible unless it is first determined on voir dire that the in-court identification is of independent origin and thus not tainted by the illegal lineup. *State v. Austin,* 276 N.C. 391, 172 S.E. 2d 507; *State v. Rogers,* 275 N.C. 411, 168 S.E. 2d 345; *State v. Wright,* 274 N.C. 84, 161 S.E. 2d 581.

**[10]**  There was no evidence offered in the presence of the jury that the witness Gwen Davis had identified the accused at a lineup and we therefore are only concerned with the admissibility of the in-court identification.

Defendant does not contend, nor does the record disclose, that the lineup in instant case was conducted in such a manner as to be unnecessarily suggestive and conducive to mistaken identification or that the procedures were such as to offend fundamental standards of decency, fairness and justice in violation of the guarantees of the Fourteenth Amendment. *Rochin v.*

*California,* 342 U.S. 165, 96 L. Ed. 183, 72 S. Ct. 205; *State v. Austin, supra; State v. Rogers, supra.*

Prior to the passage of Chapter 7A, Article 36 of the General Statutes of North Carolina, it was unquestioned that an accused could waive his right to counsel at in-custody proceedings, either orally or in writing, if he did so freely, voluntarily and understandingly. *United States v. Wade, supra; State v. Wright, supra; State v. Williams,* 274 N.C. 328, 163 S.E. 2d 353.

The provisions of Chapter 7A, Article 36 of the General Statutes grant to an accused indigent the right to have counsel at any pretrial identification procedure at which presence of the accused is required, and provides that waiver of any right granted to an indigent by that subchapter must be in writing. It further provides that there can be no waiver of such rights in capital cases. G.S. 7A-451 (b) (2) and G.S. 7A-457 (a) ; *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561.

In instant case the witness Gwen Davis testified on voir dire that she was in defendant's presence for a period of five or six hours, and during that time she sat next to him in the station wagon for about 45 minutes. He later had sexual intercourse with her against her will, and on two occasions forced her to commit the abominable crime against nature with him. It seems clear that she had ample opportunity to observe him. She instantly pointed out defendant as one of her assailants when she saw him in the lineup, and stated there was no doubt in her mind that he was one of her assailants. She further testified that her identification of him in court was based on having seen him on the 28th and 29th of June 1970, and that the identification was not based upon having seen him in the lineup.

The record shows that the lineup identification was made shortly after the crime was committed and that there had been no prior conflicting identifications or descriptions.

Defendant offered no evidence on voir dire. At the conclusion of the voir dire hearing the trial judge found facts and concluded "that her in-court identification is based upon the fact that she was with Chance over a period of substantial time from about midnight on the 28th day of the early morning hours of the 29th of June and in no way is based upon having seen him in the lineup."

One who, because of the statute, is precluded in a capital case from waiving the right to counsel during an in-custody, pretrial lineup stands in the same position as an accused who did not knowingly, understandingly and voluntarily waive the right to counsel before the enactment of Chapter 7A, Article 36 of the General Statutes. Therefore, since the State, on voir dire, showed by clear and convincing evidence that the in-court identification was of independent origin and was not tainted by the lineup procedures, the in-court identification evidence was competent.

Further, had we found error in the violation of the provisions of Chapter 7A, Article 36 of the General Statutes, the strong evidence of identification by the witness Davis, the witness Sisneros, defendant's accomplice, and the physical evidence introduced by the State, which pointed the finger of guilt to defendant Chance as one of the perpetrators of these crimes, was so overwhelmingly that any error resulting was clearly harmless error beyond a reasonable doubt. *Harrington v. California,* 395 U.S. 250, 23 L. Ed. 2d 284, 89 S. Ct. 1726; *Chapman v. California,* 386 U.S. 18, 17 L. Ed. 2d 705, 87 S. Ct. 824; *State v. Brinson,* 277 N.C. 286, 177 S.E. 2d 398; *State v. Swaney,* 277 N.C. 602, 178 S.E. 2d 399; *State v. Jacobs,* 277 N.C. 151, 176 S.E. 2d 744.

[11] We next consider whether admission into evidence of statements made by defendant to Detective Frye resulted in prejudicial error.

Detective Frye testified that he first saw defendant at the Sheriff's office and that he immediately warned defendant of his constitutional rights and that defendant then read and signed a written form which, among other things, contained the following:

" . . . . Before we ask you any questions, you must understand your rights. You have the right to remain silent; anything you say can be used against you in court; you have the right to talk to a lawyer for advice before we ask you any questions and to have him present with you during any questioning. If you cannot afford a lawyer, one will be appointed for you before any questions; but if you decide to answer questions now without a lawyer you will still have a right to stop answering any time until you talk to a lawyer."

Detective Frye testified:

"He told me that he wished to give me a statement in full as to what happened but, at the time, I did not know what county the crime had occurred in and thought it had happened in Harnett County. I told him to hold the information for the Harnett County officers.

. . . .

" . . . . I told him that a girl had been kidnapped and that a man had been murdered, and that he was a suspect. He asked me 'Is the boy dead?' I told him that the boy was dead. He then asked what happened to the girl. I told him that she made it to the road and got help. He stated that he had been worried about what had taken place and didn't want to take the rap by himself; he said that it wasn't all his fault.

"Danny stated to me that the 1962 automobile belonged to him. He said that he had bought it in Connecticut but didn't have any registration for it."

The United States Supreme Court and this Court have long recognized that a person (including an indigent) accused of a crime, capital or otherwise, could orally or in writing voluntarily waive his constitutional privilege against self-incrimination and his right to legal counsel, and any in-custody confession made by an accused was admissible into evidence when the trial judge held a voir dire and found upon competent evidence that the accused freely, understandingly and knowingly waived these rights and that the confession was voluntarily made. *State v. McRae*, 276 N.C. 308, 172 S.E. 2d 37; *State v. Wright*, 274 N.C. 84, 161 S.E. 2d 581; *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S.Ct. 1602.

In instant case the trial judge conducted a voir dire hearing, in the absence of the jury, and heard testimony from the State's witnesses concerning the admissibility of certain statements and questions allegedly made by defendant. Defendant offered no evidence.

There was ample competent evidence to sustain the trial judge's finding:

" . . . . that such statement as he gave to Detective Frye was purely voluntary and was given freely and voluntarily

and understandingly and in full knowledge of his rights at a time when the defendant was not under the influence of alcohol or any other—or had any other apparent mental abnormality. The objection to the statement as given to Mr. Frye is overruled."

However, the General Assembly of North Carolina by enactment of Chapter 7A, Article 36 of the General Statutes has stated that in a capital case there shall be no waiver of the rights granted therein by an indigent. *State v. Lynch,* 279 N.C. 1, 181 S.E. 2d 561. One of the rights there granted is the right to counsel in an "in-custody interrogation."

Did absence of counsel during the above quoted colloquy between defendant and Detective Frye result in prejudicial error? We think not.

[12] The extra-judicial statement of an accused is a confession if it admits that the defendant is guilty of the offense charged or an essential part of the offense. *State v. Hamer,* 240 N.C. 85, 81 S.E. 2d 193. The fact that such statement is made while the accused is in custody does not, in itself, render a confession incompetent. *State v. Hines,* 266 N.C. 1, 145 S.E. 2d 363; *State v. Gray,* 268 N.C. 69, 150 S.E. 2d 1.

In the case of *State v. Meadows,* 272 N.C. 327, 158 S.E. 2d 638, this Court considered whether defendant made statements as a result of a custodial interrogation. There the defendant, who was in his own yard and surrounded by family and friends, made inculpatory statements amounting to a confession to police officers immediately after he had shot the deceased person. He was not warned as to his constitutional rights as set forth in *Miranda v. Arizona, supra,* and the Court, in holding that such warning was not necessary, stated:

"In *Miranda,* the majority opinion, delivered by Mr. Chief Justice Warren, states that the constitutional issue decided 'is the admissibility of statements obtained from a defendant questioned while in custody or otherwise deprived of his freedom of action in any significant way.' Repeatedly, reference is made to 'custodial interrogation.' Thus, the opinion states: '(T)he prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to

secure the privilege against self-incrimination. By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' . . . 'Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.' "

In *Miranda v. Arizona, supra,* we also find this statement:

"The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without benefit of warnings and counsel, but *whether he can be interrogated.* There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding to-day." Id. at 478, 16 L. Ed. 2d at 726, 86 S.Ct. at 1630. (Emphasis added.)

Accord: *State v. Fletcher and St. Arnold,* 279 N.C. 85, 181 S.E. 2d 405; *State v. Morris,* 275 N.C. 50, 165 S.E. 2d 245; *State v. Perry,* 276 N.C. 339, 172 S.E. 2d 541; *State v. Spence,* 271 N.C. 23, 155 S.E. 2d 802.

In instant case it is clear that defendant was in custody, but is equally clear that no statements were made as a result of questions from the police officers. There is no evidence in this record of any interrogation or any other procedure which would tend to overbear the will of the accused as is condemned in the line of authorities represented by *Miranda.* It appears in this record that defendant wanted to make a full confession and that the police officer declined to take it. The conclusion is inescapable that the questions posed by defendant and the statements made by defendant were volunteered. We hold that under the facts and circumstances of this case there was no "in-custody interrogation." Thus, the presence of counsel was not required. The trial judge correctly admitted into evidence the statements made by defendant to Detective Frye.

We find no errors of law resulting in prejudicial error to this defendant.

No error.