STATE OF NORTH CAROLINA v. JAMES BRYAN WATSON

No. 35

(Filed 10 May 1972)

1. **Constitutional Law § 30— speedy trial — delay between warrant and trial**

Defendant was not denied his constitutional right to a speedy trial by the delay between the issuance of a warrant charging him with homicide on 19 July 1969 and his trial at the 19 April 1971 session of court, where defendant was committed to the State Hospital for 60 days upon motion of his counsel, defendant was granted continuances on two occasions, defendant was out on bail for most of the time between 12 December 1969 and the date of his trial but made no effort to obtain a speedier trial, and defendant has failed

State v. Watson

to show that he was prejudiced by the delay or that the State wilfully or by its neglect caused arbitrary or oppressive delay.

**2. Jury § 5— competency of juror — discretion of court**

The question of the competency of jurors is a matter within the trial judge's discretion, and his rulings thereon are not subject to review on appeal unless accompanied by some imputed error of law. G.S. 9-14.

**3. Jury § 5— father-in-law of solicitor — competency as juror**

The trial court did not err in the denial of defendant's challenge for cause directed to the district solicitor's father-in-law as a juror, where the challenge was allowed only after the juror stated, upon being questioned by the court, that he would not convict on his relationship to the solicitor, and after it was ascertained that the district solicitor was not prosecuting defendant's case.

**4. Constitutional Law § 29; Criminal Law § 135; Jury § 7— jurors opposed to death penalty — challenge for cause**

The trial court properly allowed the State's challenges for cause to prospective jurors who stated, in effect, that under no circumstances could they vote for a verdict which would result in the imposition of the death penalty.

**5. Constitutional Law § 31; Criminal Law § 88— right of cross-examination**

The witnesses in criminal trials must be present and subject to cross-examination. Sixth and Fourteenth Amendments to the U. S. Constitution; Article I, § 23 of the N. C. Constitution.

**6. Constitutional Law § 31— right of confrontation**

The right of confrontation is an absolute right rather than a privilege and must be afforded an accused not only in form but in substance.

**7. Constitutional Law § 31; Criminal Law § 80; Death § 1; Homicide § 15— cause of death — competency of death certificate — right of confrontation — due process — harmless error**

In a homicide prosecution, defendant's right to confrontation and his right to fundamental fairness in a criminal trial guaranteed by due process were violated by the admission in evidence of the hearsay and conclusory statement in the victim's death certificate that "the immediate cause of death was hemorrhage and asphyxia due to or as a consequence of stab wounds of left neck"; however, the admission of such evidence was harmless error beyond a reasonable doubt in view of the other overwhelming evidence of defendant's guilt. Sixth Amendment to the U. S. Constitution; Article I, § 11 (Now Article I, § 23) of the N. C. Constitution; G.S. 130-66.

**8. Criminal Law § 169— erroneous admission of evidence — violation of constitutional right**

The improper admission of evidence which violates a right guaranteed by the U. S. Constitution does not constitute prejudicial error

---

State v. Watson

---

unless there is a reasonable possibility that such evidence contributed to defendant's conviction.

ON *certiorari* to the North Carolina Court of Appeals to review its decision (13 N.C. App. 54) finding no error in the trial before *Cooper, J.*, at the 19 April 1971 Session of CUMBERLAND Superior Court.

The State's evidence, in substance, was as follows:

Shelton David Tew testified that on 19 July 1969 he and Billy Gene Horner were standing at the bar in Gib's Lounge in Fayetteville, North Carolina, drinking beer, when defendant, as he passed by, bumped into Horner. Tew, Jesse Robert Pittman and Horner passed defendant as they walked to a booth where they intended to play checkers. As they passed defendant, Horner said to him, "I will see you later." The trio sat in the booth where Horner and Pittman began to play checkers. After a few minutes, defendant approached the booth and said to Horner, "So you will see me later, will you?" Horner did not reply. Defendant slapped Horner twice, and Horner raised both hands and backed up. Defendant momentarily held a knife at Horner's throat and then thrust the knife into his neck just below the left ear. The knife was "maybe" four inches long and two inches wide. Defendant then walked to the end of the bar. Horner, beginning to bleed profusely from the neck, nose and mouth, stepped out of the booth, over to a pool table, and picked up a cue stick. He was so weak that he could only lean against the table. Tew took Horner out of the lounge and down the street for a distance of approximately 75 feet, where Horner collapsed on the sidewalk. He was at that time bleeding from the gash in his neck and from his nose and mouth. He was carried away by an ambulance a few minutes later.

Jesse Robert Pittman testified that on 19 July 1969, while he was playing checkers with Horner in Gib's Lounge, he saw defendant approaching with a knife in his hand. Pittman left the booth and walked over to the bar after defendant and Horner began to scuffle. When he next observed Horner, Horner was stepping out from the booth with blood gushing from his neck and mouth. He observed Horner stagger over to the pool table and fall. He next saw Horner lying across the hood of a car. He believed Horner was dead when he was carried away in an ambulance a few minutes later.

Douglas Davidson testified that he was a member of the Fayetteville police force on 19 July 1969, and that he and Officer Albert Tanzilo observed a person, later identified as Horner, lying on the street. He observed a trail of blood beginning at Gib's Lounge and leading to the place where Horner was lying. Horner was bleeding from his mouth, and when he tried to talk he could only make a gurgling sound. After calling an ambulance, Davidson went into Gib's Lounge in an attempt to locate witnesses. When he returned to the street he observed attendants putting Horner into an ambulance. Horner appeared to be dead at that time.

Officer Tanzilo testified to substantially the same facts as did Officer Davidson. He further testified that after the ambulance departed he and Officer Davidson proceeded about a block and a half to 204 Campbell Avenue, which was the home of defendant's parents. They there arrested defendant, who at that time had blood on his shirt, trousers and arms.

Detective Sergeant A. A. Banks testified, without objection, to certain statements made to him by defendant, including a volunteered statement by defendant that "If he (Horner) is dead, I killed him. He was a no good SOB, and he ought to be dead."

William Joyner, Director of the City-County ABC Bureau of Identification, testified, in part:

"... I recognize the photograph marked S-6 and shown to me. It is a photograph taken by me at Cape Fear Valley Hospital morgue, of Mr. Horner. That picture was taken approximately a quarter to six or six o'clock. The picture shows the body of the deceased, and puncture wound on the left side of his face. ...

"... S-6 is a photograph of the deceased, showing a puncture wound on the left side of his neck."

Defendant, testifying in his own behalf, stated that on 19 July 1969 he had been drinking whiskey and beer. He had for some time had trouble with Billy Gene Horner, and Horner had threatened to kill him in June 1969. He stated that on 19 July 1969 he walked up to the booth in which Horner was sitting and asked, "Why is it you want to kill me or jump on me every time you see me?" Thereupon Horner mumbled some-

thing, and "come up with a motion as if to hit me, which he did, and I throwed up my hand to keep him from hitting me. . . . his left hand had a sharp object in it which cut me on the leg." He did not realize Horner had been cut until he saw him bleeding at the pool table. He did not intend to kill or hurt Horner in any way.

Defendant offered a number of witnesses who gave testimony as to the occurrence in Gib's Lounge on 19 July 1969. He also offered witnesses who testified that Horner had a reputation for being a violent person. Some of the witnesses testified on cross-examination that defendant had a reputation for being a man of violent character.

The jury returned a verdict of guilty of murder in the second degree. The trial judge imposed a sentence of imprisonment of not less than 25 nor more than 30 years. Defendant appealed, and the North Carolina Court of Appeals found no error in the trial. We allowed defendant's petition for certiorari on 14 January 1972.

*Attorney General Morgan and Assistant Attorney General Magner for the State.*

*Downing, David & Vallery, by Edward J. David, for defendant.*

BRANCH, Justice.

[1] Defendant assigns as error the failure of the trial court to dismiss the prosecution on the ground that he had not been afforded a speedy trial.

The record in this case shows that the alleged crime was committed on 19 July 1969, and a warrant was issued on that day charging defendant with murder. On 30 July 1969 defendant was given a preliminary hearing and was bound over (without privilege of bond) to the Superior Court of Cumberland County for action by the grand jury. On 21 July 1969 defendant was found to be an indigent, and Mr. Edward J. David of the Cumberland County Bar was appointed as counsel for defendant. On 12 August 1969, upon motion of his counsel, defendant was committed to the State Hospital at Raleigh for a period of sixty days for observation and examination towards determining whether defendant had mental capacity to know

right from wrong and to understandingly enter a plea. On 22 September 1969 the grand jury of Cumberland County returned a true bill of indictment, charging defendant with murder. On 2 October defendant was transferred to Central Prison in Raleigh because of inadequate jail facilities in Cumberland County. Defendant filed a writ of habeas corpus on 1 November 1969, in which he alleged that he had been denied his right to a speedy trial, and alleged many other violations of his constitutional rights. On 18 November 1969 Judge Hamilton Hobgood signed a writ of habeas corpus *ad prosequendum* directing the Department of Correction to deliver defendant to the Sheriff of Cumberland County on 25 November 1969 to the end that he might be tried on 1 December 1969. On 12 December 1969 defendant was released on bond, and remained free on bond until the date of his trial except for one day in January 1970 and for approximately eleven days in August 1970, when he was in custody because his bondsman "went off his bond." On 15 December 1969 (after defendant had been released on bond) Judge Bickett denied defendant's petition for writ of habeas corpus. Defendant made no motion for a speedy trial after he was released on bond. Defendant's counsel moved for, and was granted, two continuances before the case was called for trial. Defendant's counsel again moved for a continuance after the trial court denied his motion for dismissal on the ground that he had been denied a speedy trial.

In the recent case of *State v. Spencer*, 281 N.C. 121, 187 S.E. 2d 779, this Court considered the question of speedy trial, and there stated:

"The constitutional right to a speedy trial protects an accused from extended imprisonment before trial, from public suspicion generated by an untried accusation, and from loss of witnesses and other means of proving his innocence resulting from passage of time. Whether defendant has been denied the right of a speedy trial is a matter to be determined by the trial judge in light of the circumstances of each case. The accused has the burden of showing that the delay was due to the State's wilfullness or neglect. Unavoidable delays and delays caused or requested by defendant do not violate his right to a speedy trial. Further, a defendant may waive his right to a speedy

trial by failing to demand or to make some effort to obtain a speedier trial. *State v. Ball,* 277 N.C. 714, 178 S.E. 2d 377; *State v. Hollars,* 266 N.C. 45, 145 S.E. 2d 309; *State v. Lowry* and *State v. Mallory,* 263 N.C. 536, 139 S.E. 2d 870. The constitutional right to a speedy trial prohibits arbitrary and oppressive delays by the prosecution. *State v. Johnson,* 275 N.C. 264, 167 S.E. 2d 274. But this right is necessarily relative and is consistent with delays under certain circumstances. *Beavers v. Haubert,* 198 U.S. 77, 49 L.ed. 950, 25 S.Ct. 573."

In instant case defendant's motion for a mental examination, in effect, was a motion for a continuance. Thereafter he was granted two continuances. During the period from 12 December 1969, when he was released on bond, to the date of his trial, defendant made no effort to obtain a speedier trial. He has failed to show that the delay in his trial resulted in prolonged imprisonment, created public suspicion against him, or deprived him of any means of proving his innocence. Nor does the record disclose that the State wilfully or by its neglect caused arbitrary or oppressive delay.

This assignment of error is overruled.

Defendant contends that the trial judge erred in not allowing his challenge for cause directed to the district solicitor's father-in-law as a juror.

[2] The question of the competency of jurors is a matter within the trial judge's discretion, and his rulings thereon are not subject to review on appeal unless accompanied by some imputed error of law. G.S. 9-14; *State v. Spencer,* 239 N.C. 604, 80 S.E. 2d 670; *State v. DeGraffenreid,* 224 N.C. 517, 31 S.E. 2d 523.

This Court discussed possible disqualifications of a juror because of his relationship with a State's *witness* in the case of *State v. Allred,* 275 N.C. 554, 169 S.E. 2d 833, and there stated:

"In this jurisdiction, a juror, who is related to the defendant by blood or marriage within the ninth degree of kinship, is properly rejected when challenged by the State *for cause* on that ground. . . .

\* \* \* \*

"We do not hold that a relationship within the ninth degree between a juror and a State's witness, standing

State v. Watson

alone, is legal ground for challenge for cause. This is in accord with the weight of authority in other jurisdictions. Annotation, 'Relationship to prosecutor or witness for prosecution as disqualifying juror in criminal case.' 18 A.L.R. 375; 31 Am. Jur., Jury § 192; 50 C.J.S., Juries § 218(b) (1). Even so, where such relationship exists and is known and recognized by the juror, a defendant's challenge for cause should be rejected only if it should appear clearly that, under the circumstances of the particular case, the challenged juror would have no reason or disposition to favor his kinsman by giving added weight to his testimony or otherwise. . . . "

We are unable to find a North Carolina case which considers whether a juror is disqualified because he is related within the prohibited degree to *counsel* in the case. However, the majority rule in other jurisdictions is that a juror is not disqualified by the fact that he is related to counsel involved in the case. *Petcosky v. Bowman,* 197 Va. 240, 89 S.E. 2d 4; *State of Missouri v. Jones,* 64 Mo. 391; *Roberts v. Roberts,* 115 Ga. 259, 41 S.E. 616. The Georgia cases note an exception to this general rule and hold that the juror is disqualified where the prohibited relationship exists and counsel's fee is contingent upon success in the case. *Melson v. Dickson,* 63 Ga. 682, and *Roberts v. Roberts, supra.*

[3] We note that in instant case the trial judge carefully examined the juror and denied the challenge only after the juror stated that he would not convict on his relationship to the solicitor and after it was ascertained that the solicitor (juror's son-in-law) was not prosecuting in this case. These circumstances do not show imputed error of law or abuse of discretion on the part of the trial judge in making his ruling.

This assignment of error is not sustained.

[4] Defendant assigns as error the action of the trial judge in allowing the State's challenge for cause of certain jurors because of their beliefs as to capital punishment.

Each of the jurors successfully challenged stated, in effect, that under no circumstances could he vote for a verdict which would result in the imposition of the death penalty.

A trial judge should allow challenge for cause when a venireman is not willing to consider all possible penalties provided by state law and when the venireman is unalterably committed to vote against the death penalty, regardless of the evidence which might be presented at trial. *Witherspoon v. Illinois,* 391 U.S. 510, 20 L.ed. 2d 776, 88 S.Ct. 1770; *State v. Doss,* 279 N.C. 413, 183 S.E. 2d 671; *State v. Chance,* 279 N.C. 643, 185 S.E. 2d 227; *State v. Miller,* 276 N.C. 681, 174 S.E. 2d 481.

The Court correctly sustained the State's challenges for cause.

Defendant's most serious assignment of error relates to admission into evidence, over objection, a portion of a certified copy of the victim's death certificate. He contends that admission of this evidence violated his constitutional right of confrontation and cross-examination.

We note that the record does not contain a copy of the death certificate; however, the record does show that the Judge read portions of the death certificate to the jury, and in order to consider this assignment of error we must assume that the portions read to the jury are correctly indicated in that part of the charge which states:

"The State further offered evidence in the form of an authenticated copy of a record of the Office of Vital Statistics of the State of North Carolina, State Board of Health, which in substance tends to show that Billy Gene Horner died in Cumberland County on July 19, 1969, and that the immediate cause of death was hemorrhage and asphyxia due to or as a consequence of stab wound of the left neck."

At the time of defendant's trial, Article I, § 11 of the North Carolina Constitution (now Article I, § 23) provided:

"In all criminal prosecutions, every person charged with crime has the right to be informed of the accusation and to confront the accusers and witnesses with other testimony, and to have counsel for defense, and not be compelled to give self-incriminating evidence, or to pay costs, jail fees, or necessary witness fees of the defense, unless found guilty."

[5, 6] The right of confrontation confirms the common-law rule that, in criminal trials, the witnesses must be present and subject to cross-examination. *State v. Bumper,* 275 N.C. 670, 170 S.E. 2d 457; *State v. Perry,* 210 N.C. 796, 188 S.E. 639; *State v. Hightower,* 187 N.C. 300, 121 S.E. 616; *State v. Thomas,* 64 N.C. 74. This same protection is granted by the Sixth Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment. *State v. Moore,* 275 N.C. 198, 166 S.E. 2d 652; *Pointer v. Texas,* 380 U.S. 400, 13 L.ed. 2d 923, 85 S.Ct. 1065. The right of confrontation is an absolute right rather than a privilege, and it must be afforded an accused not only in form but in substance. *State v. Bumper, supra; State v. Hightower, supra; State v. Hackney,* 240 N.C. 230, 81 S.E. 2d 778.

This Court considered the admissibility of a death certificate in a *civil action* to recover damages for wrongful death in the case of *Branch v. Dempsey,* 265 N.C. 733, 145 S.E. 2d 395. There the appellant assigned as error the exclusion from evidence of a certified copy of the death certificate. This Court held that the death certificate was properly excluded because it contained hearsay statements concerning the manner in which the collision, which allegedly caused the fatal injuries, occurred. In so doing, the Court, in part, stated:

> "The purpose of the statute appears to be to permit the death certificate to be introduced as evidence of the fact of death, the time and place where it occurred, the identity of the deceased, the bodily injury or disease which was the cause of death, the disposition of the body and possibly other matters relating to the death. We think it was not the purpose of the Legislature to make the certificate competent evidence of whatever might be stated thereon. . . . "

We note that *Branch v. Dempsey, supra,* considered G.S. 130-73, which was superseded by the present G.S. 130-66. A notable difference in the statutes is that G.S. 130-73 stated "that any copy of the record of a birth or death certificate properly certified . . . shall be prima facie evidence *in all courts* and places of the facts therein stated." (Emphasis ours.) The comparable portion of the present G.S. 130-66 (applicable in this case) states:

> "(b) The State Registrar is authorized to prepare typewritten, photographic, or other reproductions of origi-

State v. Watson

nal records and files in his office. Such reproductions, when certified by him, shall be considered for all purposes the same as the original and shall be prima facie evidence of the facts therein stated."

Our research fails to disclose a decision of this Court which considers whether the death certificate of a homicide victim is admissible into evidence to prove some element of the crime pursuant to a statute making it prima facie evidence of the facts stated therein. We note a split of authority in other jurisdictions on this question.

The Criminal Court of Appeals of Oklahoma, in the case of *Osborn v. State,* 86 Okla. Crim. 259, 194 P. 2d 176, without discussion approved the admission of a death certificate in the trial of a murder case pursuant to a statute which provided that a certified copy of a death certificate "shall be prima facie evidence in all courts and places of the facts therein stated."

In the case of *State v. Flory,* 198 Iowa 75, 199 N.W. 303, defendant was charged with the murder of his wife by administering poison. There the Supreme Court of Iowa held that the trial judge committed prejudicial error in excluding a certified copy of the death certificate of the victim when it was offered into evidence by defendant. In that state a statute provided that a properly certified death certificate was prima facie evidence of the facts therein stated in all courts and places.

The California Courts of Appeals have taken diverse views on this question. The California cases decided by these courts are reviewed and the better rule stated in the case of *People v. Holder,* 230 Cal. App. 2d 50, 40 Cal. Rptr. 655, where the Court stated:

"The authorities are in disagreement as to which elements of the death certificate are statements of 'fact' and which are not. The line between fact and opinion is often thin and indistinct. (Citations omitted.) Occurrence of death is doubtless a fact which is proved prima facie by the certificate. (Citations omitted.) The cause of death, however, may amount only to an opinion or conclusion, sometimes resulting from inferences drawn by a medical expert. . . . Other decisions assume without discussion that cause of death (no matter how dependent on medical con-

State v. Watson

clusions) is a fact which may be established prima facie by certificate. (Citations omitted.) . . . .

"The point of the matter is not that conclusionary entries on death certificates are necessarily unreliable; rather, that Health and Safety Code section 10577 would permit their admission as hearsay. The coupling of hearsay and conclusionary elements in a single piece of evidence arouses the more fundamental problem of fairness to the defendant in a criminal case. The cause of death entry may emanate from a complex value judgment drawn by a medical expert. (See, for example, *Longuy v. La Societe Francaise,* 52 Cal. App. 370, 198 P. 1011.) When it rides into the fray mounted on a saddle of a public document, it is unaccompanied by the expert. The latter appears in court only in the form of the document. He himself is not available for cross-examination by the defense."

See also 30 Am. Jur. 2d, Evidence, § 1009, p. 143, and Annotation: Evidence—Official Death Certificate, 21 A.L.R. 3d 418.

[7] The clear mandate of Article I, § 11 (now Article I, § 23) of the North Carolina Constitution, and the Sixth Amendment to the United States Constitution guaranteeing the right of confrontation and cross-examination, and the fundamental fairness guaranteed to an accused in a criminal action by due process of law require that we hold that the trial judge erroneously admitted the hearsay and conclusory statement contained in the death certificate, "that the immediate cause of death was hemorrhage and asphyxia due to or as a consequence of stab wound of the left neck."

However, we must determine if the admission of this evidence as to cause of death was such prejudicial error as to require a new trial.

[8] The fact that the improper admission of this evidence violated a right guaranteed by the United States Constitution does not, per se, render the error prejudicial. *Chapman v. California,* 386 U.S. 18, 17 L.ed. 2d 705, 87 S.Ct. 824; reh. den. 386 U.S. 987, 18 L.ed. 2d 241, 87 S.Ct. 1283; *Harrington v. California,* 395 U.S. 250, 23 L.ed. 2d 284, 89 S.Ct. 1726. Unless there is a reasonable possibility that the improperly admitted evidence contributed to defendant's conviction, there is no prejudicial error. *Chapman v. California, supra.*

State v. Watson

We deem it appropriate to here note the recent United States Supreme Court decision in the case of *Schneble v. Florida* (March 21, 1972; 40 U.S.L.W. 4299), 405 U.S. 427, 31 L.ed. 2d 340, 92 S.Ct. 1056. There the confession of a codefendant was admitted against the defendant and the confessor was not present for the purposes of confrontation and cross-examination by the defendant. This evidence corroborated other independent, objective evidence strongly pointing to defendant's guilt. The United States Supreme Court held that the admission into evidence of the confession of the codefendant was error, but that in view of the other overwhelming evidence of the defendant's guilt, such error was not reversible error.

The challenged evidence admitted in instant case relates to the same constitutional right, but is less persuasive than that complained of in *Schneble v. Florida, supra.*

We conclude that the evidence in this case clearly and overwhelmingly supports a reasonable inference that defendant intentionally used a deadly weapon and thereby inflicted a would which proximately caused Horner's death, and that the minds of an average jury would not have found the evidence less persuasive had the conclusory evidence contained in the certified copy of the death certificate been excluded. The admission of the evidence contained in the certified copy of the death certificate was at most harmless error beyond a reasonable doubt. *Schneble v. Florida, supra; Chapman v. California, supra.*

Finally, defendant argues that the trial judge erred in overruling his motions for judgment as of nonsuit.

In light of the preceding ruling, we do not deem it necessary to discuss this assignment of error at length. It is sufficient to say that upon application of the often-repeated and well-recognized rules as to the sufficiency of evidence to overrule a motion for nonsuit, we conclude that there was plenary evidence to repel defendant's motion. See 2 Strong's N. C. Index 2d, Criminal Law § 106, p. 654, and cases there cited.

We have carefully reviewed this entire record and find no prejudicial error.

The decision of the Court of Appeals is

Affirmed.