IN THE SUPREME COURT OF NORTH CAROLINA

2022-NCSC-16

No. 467A20

Filed 11 February 2022

STATE OF NORTH CAROLINA

v.

RAFAEL ALFREDO PABON

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 273 N.C. App. 645 (2020), finding no prejudicial error in judgments entered on 14 December 2018 by Judge Christopher W. Bragg in Superior Court, Cabarrus County. On 15 December 2020, the Supreme Court allowed defendant's petition for discretionary review of an additional issue pursuant to N.C.G.S. § 7A-31. Heard in the Supreme Court on 9 November 2021.

*Joshua H. Stein, Attorney General, by Jeffrey B. Welty, Special Deputy Attorney General, for the State-appellee.*

*George B. Currin, for defendant-appellant.*

HUDSON, Justice.

¶ 1 Here we consider whether defendant was prejudiced by the trial court's admission of certain testimony that we assume without deciding violated the Confrontation Clause of the Sixth Amendment and Rule 404(b) of the North Carolina Rules of Evidence. Because we conclude that even assuming there was error, defendant was not prejudiced, we modify and affirm the ruling of the Court of

Appeals.

## I. Factual and Procedural Background

**A. Trial**

On 23 January 2017, a Cabarrus County grand jury indicted defendant Rafael Pabon for the second-degree forcible rape and first-degree kidnapping of Samantha Camejo-Forero (Forero). On 6 March 2017, superseding indictments were issued for the same charges. Beginning on 4 December 2018, defendant was tried by a jury in Superior Court, Cabarrus County, with Judge Christopher W. Bragg presiding.

At trial, the State's evidence tended to show as follows: Defendant first met Forero in November 2015 to discuss a roof repair warranty. At the time, Forero worked "flipping houses" in the Charlotte area, and defendant worked as a construction contractor. After their initial meeting, defendant and Forero communicated periodically via text or phone call about work projects, their professions, and their families. Defendant was married and had a daughter; Forero was unmarried and had a son. Forero testified that she developed a friendship with defendant and that they would occasionally get together for lunch or coffee.

On the morning of 4 January 2017, defendant and Forero planned to get breakfast together. Forero testified that she had recently purchased a house and wanted to see if defendant could help her find a painter. Shortly after 8:30am, defendant picked Forero up at her house in Matthews. Defendant

had—unprompted—brought Forero a latte, which he handed to her to drink. Very quickly after starting to drink the latte, Forero began "feeling weird." Forero testified feeling as if "you were in a movie[,] like . . . it wasn't your body but you know you're there but you're not." Forero began having difficulty moving and could not think clearly.

¶ 5     After driving for around forty-five minutes from Matthews to Concord, defendant and Forero arrived at a Denny's restaurant. Forero testified that she could not read the menu, had difficulty controlling her body and mind, and could not remember if she ate. Video surveillance footage from the Denny's, which was played at trial, showed Forero slouching at the table, staring into space, struggling to put food into her mouth, nodding off, falling over, and having difficulty walking while leaving. Demekia Harold-Strod, the waitress who served defendant and Forero, testified that Forero looked as if she was on drugs, was moving very slowly, had her head down a lot, and made little or no eye contact.

¶ 6     After leaving Denny's around 10:30 a.m., defendant drove Forero about thirty minutes away to his friend Mark Stones's house. Defendant claimed that he needed to pick up Stones's mail while Stones was out of town. Stones' house was located in a secluded, wooded area without any close neighbors. When defendant and Forero entered the house, Forero sat on a couch. Forero testified that defendant then sat next to her on the couch and began making unwanted sexual advances toward her,

including kissing and touching her, pulling up her sweater, and kissing her breast. Forero testified that although she did not want or consent to defendant's advances, she was mentally and physically incapacitated and unable to stop them. Forero testified that defendant then picked her up, carried her to a nearby bedroom, and laid her on a bed. Defendant removed his clothes, removed Forero's underwear, and continued to kiss and touch her. Forero testified that defendant then engaged in nonconsensual vaginal intercourse with her. Forero testified that she later walked to a nearby bathroom, where she saw a used condom on the floor. Afterward, defendant acted "like nothing happened."

Around 12:45 p.m., defendant and Forero left Stones's house and began driving back to Forero's house. During the drive, Forero's mother, Aura Forero de Camejo (Camejo), who lived with Forero, called Forero's cell phone. Camejo testified that she called Forero "because [she] thought it was strange that a breakfast would have lasted so long." Forero answered, and the two had a short conversation. Camejo testified that Forero's speech was significantly slurred, that she had difficulty speaking, and that she had never sounded like that before. Forero did not remember talking to Camejo. Forero still could "not feel anything" and "didn't feel [herself]." She could not remember most of the drive home.

Around 1:30 p.m., defendant dropped Forero back off at her home. Camejo testified that upon arriving, Forero was very pale, was swaying as she walked, and

"looked like a zombie or a dead person." Forero immediately threw herself onto Camejo's bed and went to sleep. Forero slept through an alarm at 3:10 p.m. to pick her son up from the bus stop and still could not get up when her son arrived home and began shaking her and calling for her to wake up.

¶ 9        Around 5:00 p.m., Forero woke up and still felt "weird[,]" "couldn't walk straight[,]" and "couldn't think." Forero testified that "the first thing I ha[d] on my mind when I woke up . . . was him, it was his face all over me, and I knew what happen[ed]." At 5:23 p.m., Forero texted defendant to ask him what had happened because although she knew, she "want[ed] him to tell [her]." At 5:28 p.m., defendant called Forero and told her that nothing had happened—that after having breakfast at Denny's he had picked up the mail at Stones's house while she waited in the car, and then took her back home. After talking to defendant on the phone, Forero fell back asleep for the rest of the evening.

¶ 10        The next day, 5 January 2017, Forero again called defendant to ask him what had happened. Forero told defendant that she still did not feel well from the previous day and that she couldn't remember what had happened. Defendant again claimed that nothing unusual had happened, that they had just eaten breakfast and went to Stones's house to pick up the mail.

¶ 11        Forero then began researching online about "resources for victims of rape" and "how to report a rape." She contacted the Matthews Police Department and was

directed to take a rape test at a hospital. She then left for the hospital "dressed the exact same way that she was [the] night before."

¶ 12          Forero went to Novant Health Presbyterian Medical Center in Charlotte. There, Lucille Montminy, a sexual assault nurse examiner, conducted Forero's sexual assault examination. During the pre-examination interview, Forero told Montminy that defendant had raped her the day before and recounted her memory of the events surrounding the rape. At trial, Montminy testified that Forero's account of the events during this interview was fully consistent with Montminy's knowledge of drug-assisted sexual assaults, including memory loss, confusion about the events, and feeling sick. During the subsequent physical examination, Montminy noted injuries to Forero's vaginal area that were "indicative of a penetration injury" from a penis. After the physical examination, Montminy collected blood and urine samples to be used in subsequent testing.

¶ 13          The next day, 6 January 2017, Forero gave a formal statement to detectives at the Matthews Police Department, who later transferred the case to the Cabarrus County Sheriff's Office. Forero granted detectives access to her phone, including her text messages, call records, and location data. Forero also provided detectives a hair sample to be used in subsequent testing.

¶ 14          At trial, the State presented testimony from two forensic toxicologists involved in the testing and analysis of Forero's biological samples: Frank Lewallen and Dr.

Ernest Lykissa. Frank Lewallen was the forensic scientist manager at the Triad Regional Laboratory of the North Carolina State Crime Laboratory, located in Greensboro. Lewallen testified that his lab analyzed samples of Forero's blood and urine collected on 5 January 2017 during the sexual assault examination. Lewallen specified that he did not personally perform any of the testing of Forero's samples; rather, the testing was performed by two other forensic toxicologists, Brian Morse and Megan Deitz, and Lewallen subsequently reviewed their analysis. Lewallen noted that at the time of trial, Morse and Deitz were attending a training in Indiana.

¶ 15 Lewallen testified that while the initial screening of Forero's blood samples screened negative for drugs or alcohol, the initial screening of her urine sample revealed "a positive indication for Amphetamine and Methylenedioxyamphetamine and for Benzodiazepines." Next, Lewallen testified that a subsequent confirmatory analysis test performed by Deitz again detected these results. Specifically, the following exchange took place regarding Lewallen's review of Deitz's confirmatory testing:

> [Prosecutor]: So was this test performed in accordance with the state crime lab operating procedures?
>
> [Defense Counsel]: Objection. Hearsay and confrontation.
>
> THE COURT: Overruled.
>
> [Lewallen]: Yes, ma'am, it was.
>
> [Prosecutor]: And were you able to personally review all of

the data that the test produced?

[Defense Counsel]: Objection. Hearsay and confrontation.

THE COURT: Overruled.

[Lewallen]: Yes, ma'am, I was.

[Prosecutor]: Okay. Were you able to form an opinion about that test?

[Defense Counsel]: Objection. Hearsay and confrontation.

THE COURT: Overruled.

[Lewallen]: Yes, ma'am, I was.

[Prosecutor]: What was the result of that test?

[Defense Counsel]: Objection. Hearsay and confrontation.

THE COURT: Overruled.

[Lewallen]: For the blood, no substances were found present in the blood sample. In the urine sample, 7-aminoclonazepam was detected.

[Prosecutor]: And what is 7-aminoclonazepam?

[Lewallen]: That is a biological metabolite or breakdown product of Clonazepam[,] which is a Benzodiazepine.

¶ 16      Lewallen then explained that Clonazepam is an anticonvulsant drug with potential side effects including decreased pulse, decreased blood pressure, drowsiness, dizziness, sedation, muscular incoordination, and amnesia. Lewallen testified that a person who ingests Clonazepam could be significantly impaired,

including not remembering events, experiencing a dreamlike state, and exhibiting speech impairment. Lewallen further noted that Clonazepam "has been documented to be used in [drug-facilitated sexual assault] cases."

¶ 17        The State also presented testimony from Dr. Lykissa. Dr. Lykissa was the director of ExperTox Laboratories in Houston, Texas, which analyzed Forero's hair sample. After testing the hair sample, Dr. Lykissa determined that Forero's hair contained significant levels of Cyclobenzaprine, a muscle relaxant. Lykissa testified that, as a muscle relaxant, Cyclobenzaprine "floods the brain with serotonin," the neurotransmitter that causes sleep. Lykissa noted that, in excess, Cyclobenzaprine could "numb you to death[,]" and that drugs of this type "ha[ve] been known for a lot of overdoses out there."

¶ 18        In addition to his testimony regarding the hair analysis, Dr. Lykissa confirmed that the State Crime Lab found Clonazepam in Forero's urine sample. Dr. Lykissa testified that, if ingested together, Cyclobenzaprine and Clonazepam can have a "[s]ynergistic effect" resulting in "[v]ery serious impairment of [the person's] mental and physical faculties." These effects would likely be intensified, Lykissa testified, by a combination of the drugs with caffeine. Lykissa testified that a mix of these types of drugs are common in drug-facilitated sexual assaults, and that Forero's symptoms were consistent with such a combination.

¶ 19        The State also presented testimony from Kari Norquist, a former forensic

scientist at the State Crime Lab. Norquist testified that she conducted a DNA analysis of Forero's rape test samples, including a swab from Forero's breast. Norquist determined that there were substantial amounts of defendant's DNA on Forero's breast swab and that the amount of defendant's DNA present was not common from a "casual transfer."

¶ 20        After Norquist, the State sought to present testimony from two of defendant's sisters-in-law: Chanel Samonds and Elise Weyersberg. In a voir dire hearing outside the presence of the jury, Samonds and Weyersberg both testified that defendant had previously sexually assaulted them. Based on the voir dire testimony and the arguments by the State and defense counsel, the trial court determined that Samonds and Weyersberg's testimony was admissible under Rule 404(b) of the North Carolina Rules of Evidence as tending to illustrate intent and a common scheme or plan. The court further determined that the danger of unfair prejudice from the testimony did not substantially outweigh its probative value and that the testimony was therefore also admissible under Rule 403. Finally, the trial court informed counsel that it would provide the jury with a limiting instruction regarding their testimony. With these preliminary issues resolved, the State was allowed to present Samonds's and Weyersberg's testimony to the jury.

¶ 21        Samonds, the wife of defendant's brother-in-law, testified first. Samonds testified that defendant raped her on 8 September 2008. Specifically, Samonds

testified that defendant came to her house, began making unwanted sexual advances while the two sat on the couch, and engaged in forcible, nonconsensual vaginal intercourse after Samonds repeatedly told him to stop. On cross-examination, Samonds testified that defendant was not prosecuted for this alleged rape.

¶ 22 Weyersberg, the sister of defendant's wife, testified next. Weyersberg testified that in 2006 or 2007, when she was nineteen or twenty years old, defendant made several unwanted sexual advances towards her while she lived at her parent's house. Weyersberg testified that during the first incident defendant came up behind her, started rubbing her shoulders, and began moving toward her breasts. When Weyersberg walked away, defendant followed and began rubbing her shoulders again. During this incident, defendant "was telling [Weyersberg] about how he had an orgy in Bolivia[,]" which made her "very uncomfortable." On a different occasion, when Weyersberg was alone downstairs in her parent's house, defendant asked her if she wanted to use massage oils with him and tried putting his hand up her pant leg. Weyersberg testified that defendant finally stopped when she went upstairs to her room.

¶ 23 After both Samonds's and Weyersberg 's testimony, the trial court gave the jury the following instruction:

> [T]he testimony of [the witness] is received solely for the purpose of showing that the defendant had the intent which is a necessary element of the crime charged in this case[,] and/or that there existed in the mind of the

> defendant a plan, scheme, system, or design involving the
> crime charged in this case. If you believe this evidence, you
> may consider it but only for the limited purpose for which
> it was received. You may not consider it for any other
> purpose.

After the State completed its evidentiary showing, defendant testified in his own defense. Defendant claimed that he and Forero had a romantic relationship beyond a common friendship. Regarding the events of 4 January 2017, defendant testified that he and Forero went to breakfast at Denny's, stopped at Stones's house, and engaged in consensual sexual activity short of intercourse at Stones's house. Regarding Forero's abnormal state of mind and body that day, defendant suggested that perhaps Forero had a virus, but conceded that he "did not [know] at the time."

On 14 December 2018, the jury found defendant guilty of second-degree forcible rape and first-degree kidnapping. The trial court sentenced defendant to consecutive terms of 104 to 185 months' imprisonment for the rape conviction and 104 to 137 months' imprisonment for the kidnapping conviction. Based on the rape conviction, the trial court ordered defendant to enroll in lifetime satellite-based monitoring upon his release from imprisonment. Defendant timely appealed.

**B. Court of Appeals**

On appeal, defendant alleged seven trial court errors: (1) that the trial court erred when it denied his motions to dismiss; (2) that the trial court erred when it admitted 404(b) evidence of alleged prior wrongs; (3) that the trial court erred when

it admitted expert testimony in violation of the Confrontation Clause; (4) that the indictments were facially invalid; (5) that the trial court erred when it failed to properly instruct the jury; (6) that the trial court erred when it allowed the jury to consider evidence of aggravating factors; and (7) that the trial court erred when it ordered defendant to enroll in satellite-based monitoring.

¶ 27    On 6 October 2020, the Court of Appeals filed an opinion rejecting each of defendant's arguments and "find[ing] that [d]efendant received a fair trial free of prejudicial error." *State v. Pabon*, 273 N.C. App. 645, 671 (2020). Specifically, two of the seven issues raised by defendant are pertinent to this appeal.

¶ 28    First, the Court of Appeals rejected defendant's argument that the trial court erred in admitting the testimony of Lewallen in violation of the Confrontation Clause of the Sixth Amendment. *Id.* at 661. Defendant argued that "Lewallen failed to provide an independent opinion regarding the testing and analysis of [Forero]'s blood and urine samples because both tests were performed by two nontestifying forensic toxicologists." *Id.* Defendant further asserted that because the nontestifying experts were not unavailable to testify and he did not have a prior opportunity to cross-examine them, the admission of Lewallen's testimony regarding the test results violated defendant's rights under the Confrontation Clause. *Id.*

¶ 29    The Court of Appeals disagreed. Specifically, the court held that Lewallen "offered his own opinion, without reference to or reliance upon the opinions or

conclusions of the nontestifying technicians." *Id.* at 666. "Thus," the court held, "Lewallen's opinion was based on his own analysis and was not merely surrogate testimony for an otherwise inadmissible lab report or signed affidavit certifying the nontestifying technician's results." *Id.* Further, because Lewallen's independent expert opinion was the substantive evidence that defendant had the right to, and did in fact, confront through cross-examination, the court held that "[d]efendant's Confrontation Clause rights were not violated, [and] the trial court did not err in admitting Lewallen's expert testimony." *Id.* at 667.

¶ 30    Second, the Court of Appeals rejected defendant's argument regarding Rule 404(b) evidence. Defendant argued that the trial court erred in admitting Samonds's and Weyersberg's testimony regarding defendant's alleged prior sexual assaults under Rule 404(b). Noting that "[t]his Court has been markedly liberal in admitting evidence of similar sex offenses by a defendant for purposes [outlined] in Rule 404(b)[,]" the Court of Appeals agreed with the trial court that the Samonds and Weyersberg testimony contained sufficient similarities with the present allegations to be admissible as evidence of a common plan or scheme under that rule. *Id.* at 659 (second alteration in original) (quoting *State v. Bagley*, 321 N.C. 201, 207 (1987)). Specifically, the Court of Appeals highlighted three similarities between all three allegations: (1) "each woman testified that [d]efendant gained their trust prior to each incident"; (2) "[d]efendant utilized that position of trust to sexually assault each

woman"; and (3) "[d]efendant tried to persuade each victim that he had not sexually assaulted them." *Pabon*, 273 N.C. App. at 659–60.

¶ 31        Regarding the temporal proximity element of Rule 404(b) analysis, the Court of Appeals held that "[b]ecause these acts were performed continuously over a period of years, the acts were not too remote to be considered for the purposes of 404(b)." *Id.* at 660. Finally, the Court of Appeals held that the trial court did not abuse its discretion in ruling that the probative value of the Samonds and Weyersberg testimony was not substantially outweighed by the danger of unfair prejudice under Rule 403. *Id.* at 661. Accordingly, the Court of Appeals held that the trial court did not err in admitting the State's Rule 404(b) evidence. *Id.*

¶ 32        Judge Murphy dissented in part from the Court of Appeals' majority opinion. While Judge Murphy concurred with the majority's analysis regarding the motion to dismiss, the Rule 404(b) evidence, and the indictment, he disagreed with the majority's Confrontation Clause analysis. *Id.* at 675 (Murphy, J., concurring in part and dissenting in part). Specifically, the dissent would have found that Lewallen's testimony regarding the forensic reports did not provide an independent expert opinion but rather "simply parroted the conclusions of a test performed by another person not subject to the confrontation required by the United States Constitution." *Id.* at 674–75. Accordingly, the dissent would have held that "Lewallen's testimony was inadmissible and [d]efendant is entitled to a new trial free from this prejudicial

violation of his constitutional rights." *Id.* at 675.

**C. Present Appeal**

¶ 33        On 10 November 2020, defendant simultaneously gave notice of appeal based on the Confrontation Clause issue raised in Judge Murphy's dissent and petitioned this Court for discretionary review on the other issues he raised before the Court of Appeals. On 15 December 2020, this Court allowed defendant's petition for discretionary review as to one additional issue: the admission of the Samonds and Weyersberg testimony under Rule 404(b).

¶ 34        Before this Court, defendant asserts that the trial court committed two prejudicial errors: (1) overruling his Confrontation Clause objections to the testimony of Lewallen regarding the tests performed by a nontestifying chemical analyst; and (2) overruling his objections to the Rule 404(b) testimony of Samonds and Weyersberg.

¶ 35        First, defendant argues that the trial court erred in overruling his Confrontation Clause objections to the testimony of Lewallen, the State's expert from the State Crime Lab, regarding the forensic tests performed by a nontestifying chemical analyst. In alignment with the Court of Appeals dissent, defendant argues that Lewallen did not provide an independent opinion as to the presence of the Clonazepam in Forero's urine sample but merely parroted the results of the test of a nontestifying analyst. Further, defendant alleges that this error was prejudicial

because Lewallen's testimony regarding the presence of Clonazepam in Forero's urine sample was "crucial to the State's case." Specifically, defendant contends that because the State emphasized the "synergistic effect of mixing the two drugs and how this mixture would cause very serious impairment of a person's mental and physical faculties[,] . . . the State would have been hard pressed to prove its case" in the absence of Lewallen's testimony.

¶ 36    Second, defendant argues that the trial court erred in overruling his objections to the Rule 404(b) testimony of Samonds and Weyersberg. Defendant asserts that the Samonds and Weyersberg testimony fall short of both requirements of Rule 404(b): sufficient similarity and temporal proximity. Regarding the first requirement, defendant argues that any similarities between the alleged prior bad acts and the crimes for which he was charged were too generic in light of the stark dissimilarities between the alleged acts to be considered admissible. Regarding the second requirement, defendant argues that the elapsed time between the alleged prior bad acts and the current charges—eight and one-half years and ten years, respectively— renders them too attenuated to reasonably suggest intent or any common scheme or plan. Finally, defendant asserts that the trial court's erroneous admission of the Samonds and Weyersberg testimony was prejudicial because "[t]here was not overwhelming evidence of [d]efendant's guilt and [d]efendant testified at trial and denied [Forero]'s allegations." Rather, defendant contends that the case boiled down

to a "credibility contest" between him and Forero, and that the improper admission of the Samonds and Weyersberg testimony of alleged prior sexual assaults therefore prejudicially bolstered Forero's credibility with the jury while undermining his own.

¶ 37        In response, the State contends that neither the Confrontation Clause issue nor the Rule 404(b) issue amounted to trial court error, and even assuming they did, neither error would be prejudicial. Regarding the first issue, the State argues that Lewallen's testimony offered his independent expert opinion on the forensic analysis, therefore complying with the requirements of the Confrontation Clause. Regarding the second issue, the State argues that the Samonds and Weyersberg testimony, for the reasons expressed by the Court of Appeals, was both sufficiently similar and temporally proximate to the present charges to be properly admitted under Rule 404(b). In any event, the State argues, even assuming that these issues constituted errors, neither would be prejudicial. The State contends that even without the testimony in question, "[i]n light of the supporting testimony and physical evidence, no reasonable juror would have been left with the impression that . . . [d]efendant's version of events was truthful."

## II.    Analysis

¶ 38        After careful consideration, we assume, without deciding, that the trial court erred on both the Confrontation Clause issue and the Rule 404(b) issue, but nevertheless determine that neither assumed error was prejudicial.

**A. Confrontation Clause: Independent Expert Opinion Testimony**

¶ 39     First, we consider defendant's Confrontation Clause claim. This Court reviews alleged constitutional errors in the admission of testimony in violation of the Confrontation Clause de novo. *State v. Ortiz-Zape*, 367 N.C. 1, 10 (2013).

¶ 40     The Sixth Amendment to the United States Constitution establishes that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him[.]" U.S. Const. amend VI. This "bedrock procedural guarantee applies to both federal and state prosecutions." *Crawford v. Washington*, 541 U.S. 36, 42 (2004) (citing *Pointer v. Texas*, 380 U.S. 400, 406 (1965)). Although the basic theory of the right to confront one's accusers "dates back to Roman times[,]" our country's "immediate source of the concept . . . was the [English] common law. *Crawford*, 541 U.S. at 43.

¶ 41     Modern times and technologies introduced a new question to this old right: who does the accused have the right to confront when the "accuser" is a not a person, but a forensic report? In 2011, the Supreme Court of the United States answered this question in *Bullcoming v. New Mexico*. 564 U.S. 647 (2011). There, the principal evidence presented against defendant Donald Bullcoming in his trial for driving while intoxicated was "a forensic laboratory report certifying that [his] blood-alcohol concentration was well above the [legal] threshold." *Id.* at 651. "At trial, the prosecution did not call as a witness the analyst who signed the certification. Instead,

the State called another analyst who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on Bullcoming's blood sample." *Id.* The Court held that this did not satisfy Bullcoming's rights under the Confrontation Clause because the testifying analyst provided mere "surrogate testimony" without expressing any " 'independent opinion' concerning Bullcoming's BAC."

¶ 42        Since *Bullcoming*, this Court has sought to apply this constitutional protection with fidelity. In *Ortiz-Zape*, for instance, because a forensic scientist "testified as to her opinion that a substance was cocaine based upon her independent analysis of testing performed by another analyst in her laboratory[,]" this Court held that "the testifying expert was the witness whom defendant had the right to confront." 367 N.C. 1, at 2, 12–13 (2013). Accordingly, we reversed the Court of Appeals' holding that the expert's testimony violated the Confrontation Clause. *Id.* at 14.

¶ 43        In *State v. Craven*, 367 N.C. 51, (2013), this Court reached the opposite conclusion on the same question where a forensic chemist who had not personally performed the testing of the alleged cocaine "testified about the identity, composition, and weight of the substances recovered" from the defendant. *Id.* at 54. However, based on a review of the testimony, this Court determined that the testifying witness "did not offer—or even purport to offer—her own independent analysis or opinion on the . . . samples. Instead, [she] merely parroted [the nontestifying analysts']

conclusions from their lab reports." *Id.* at 56–57. Accordingly, this Court held that the testifying expert's "surrogate testimony violated defendant's Sixth Amendment right to confrontation." *Id.* at 57.

¶ 44 When a Confrontation Clause violation is established, the reviewing court must then "determine if the admission of [the offending] evidence . . . was such prejudicial error as to require a new trial." *State v. Watson*, 281 N.C. 221, 232 (1972). "A violation of the defendant's rights under the Constitution of the United States is prejudicial unless the appellate court finds that it was harmless beyond a reasonable doubt." N.C.G.S. § 15A-1443(b). "The burden is upon the State to demonstrate, beyond a reasonable doubt, that the error was harmless." N.C.G.S. § 15A-1443(b). If it does so, the jury's verdict is not disturbed on appeal, in spite of a Confrontation Clause violation. *See Watson*, 281 N.C. at 233 (determining that a Confrontation Clause error was harmless beyond a reasonable doubt).

¶ 45 Here, we assume without deciding that the trial court's admission of Lewallen's testimony regarding the results of Deitz's confirmatory test of Forero's urine sample violated defendant's right to confrontation under the Sixth Amendment. However, because we conclude that this assumed error was harmless beyond a reasonable doubt, we modify and affirm the holding Court of Appeals finding no prejudicial error on this issue.

¶ 46 First, any improper testimony from Lewallen was not the only evidence of

Clonazepam in Forero's urine sample. Rather, Lewallen testified about two distinct findings of Clonazepam in Forero's sample: first describing the "initial" or "preliminary" testing, and then describing the "confirmatory" testing. As to Deitz's confirmatory testing, Lewallen testified as follows:

> [Prosecutor]: What was the result of that test?
>
> [Defense Counsel]: Objection. Hearsay and confrontation.
>
> THE COURT: Overruled.
>
> [Lewallen]: For the blood, no substances were found present in the blood sample. In the urine sample, 7-aminoclonazepam was detected.
>
> [Prosecutor]: And what is 7-aminoclonazepam?
>
> [Lewallen]: That is a biological metabolite or breakdown product of Clonazepam[,] which is a Benzodiazepine.

This quoted testimony formed the basis of defendant's Confrontation Clause argument on appeal and is the testimony which we assume without deciding violated the Confrontation Clause.

As to the "initial" or "preliminary" testing, though, Lewallen testified as follows:

> [Prosecutor]: Okay. What opinion did you form about that initial screening test?
>
> [Defense Counsel]: Objection. Hearsay and confrontation.
>
> THE COURT: Overruled.

> [Lewallen]: For the blood it was negative for all 12 assays. For the urine we had a positive indication for Amphetamine and Methylenedioxyamphetamine and for Benzodiazepines.

Although defendant objected to this testimony at trial, this was not the testimony upon which defendant based his Confrontation Clause argument on appeal and is not part of any assumed error.

¶ 48     Accordingly, based on Lewallen's testimony regarding the initial testing, even in the absence of his subsequent testimony regarding the confirmatory testing, there was still competent evidence before the jury of the presence of Clonazepam in Forero's urine sample. Therefore, Dr. Lykissa's testimony regarding the "synergistic effect" of the combination of both Clonazepam and Cyclobenzaprine in drug-facilitated sexual assaults would still have been grounded in the evidence.

¶ 49     Next, the State has demonstrated that even in the absence of *any* of Lewallen's testimony regarding the presence of Clonazepam in Forero's urine sample, the jury would still have had ample evidence of Cyclobenzaprine in Forero's hair sample through Dr. Lykissa's testimony. Although defendant correctly notes that the State emphasized the synergistic effect of the combination of the two drugs, Dr. Lykissa also testified about the potential impact of Cyclobenzaprine alone. Specifically, Dr. Lykissa noted that Cyclobenzaprine is a "muscle relaxant," "it floods the brain with serotonin[,]" "it can numb you to death," it "is notorious," its effects would be heightened by the ingestion of caffeine, and "[i]t's in the same family of Amitriptyline,

[which] has been known for a lot of overdoses out there."

¶ 50          This evidence, even in the absence of Lewallen's testimony regarding Clonazepam and the synergistic effects, still support the State's evidence of Forero's symptoms on 4 January 2017—namely dizziness, rapid decline of motor skills, confusion, drowsiness, memory loss, and a generally dreamlike state. Notably, these symptoms were not established by Lewallen's testimony, or even by Lykissa's, but by the testimony of those who observed them firsthand: Forero's mother, the sexual assault nurse examiner, the Denny's waitress, the Denny's surveillance video, and, of course, Forero herself. The ample evidence of the presence of Cyclobenzaprine in Forero's hair sample, the known effects of Cyclobenzaprine, and the evidence of Forero's symptoms strongly supported the State's case of drug-facilitated sexual assault. Accordingly, the State has demonstrated that even without Lewallen's testimony, any reasonable jury would likely have reached the same conclusion based on the other evidence.

¶ 51          Moreover, even setting aside the assumedly improper Lewallen testimony would neither disturb nor undermine the other overwhelming evidence of defendant's guilt. The jury was presented with extensive testimony from eighteen witnesses supporting the State's theory of defendant's actions, filling nearly one thousand transcript pages. The State also submitted 146 exhibits for the jury's consideration.

¶ 52          Of course, sheer volume is not dispositive; the State has also demonstrated

that Forero's testimony was extensive, detailed, and consistent, revealing numerous indications of drug-facilitated sexual assault. Further, her testimony was corroborated by that of Forero's mother and the Denny's waitress, who directly witnessed her appearance, behavior, speech, and demeanor on 4 January 2017. Next, a procession of highly trained and experienced medical, forensic, and law enforcement professionals further supported Forero's claims, including Montminy (the sexual assault nurse examiner), Norquist (the rape kit examiner), Dr. Lykissa, Detective Danielle Helms (Matthews Police Department), Lieutenant Kevin Pfister (Cabarrus County Sheriff's Office), and Detective Sergeant April Samples (Cabarrus County Sheriff's Office), among several others. Finally, the State's exhibits were also potent and corroborative, particularly the Denny's surveillance video, Dr. Lykissa's report, the rape kit evidence, and the DNA evidence. In considering this overwhelming evidence against defendant, we conclude that the State met its burden of demonstrating that, even assuming that the admission of the Lewallen testimony was erroneous, "the minds of an average jury would not have found the [remaining] evidence less persuasive had the [erroneous] evidence . . . been excluded." *Watson*, 281 N.C. at 233. As such, any Confrontation Clause error was harmless beyond a reasonable doubt.

¶ 53 Defendant's attempts to undermine the State's demonstration of no prejudice are unavailing. Specifically, defendant asserts that "[t]he prejudice . . . is manifest as

th[e] improperly admitted evidence was crucial to the State's case." Defendant contends that because the State emphasized the "synergistic effects" of combining Clonazepam and Cyclobenzaprine, "it is obvious that without Lewallen's inadmissible testimony . . . , the State would have been hard pressed to prove its case."

¶ 54 We cannot agree. As noted above: (1) other portions of Lewallen's testimony also established his opinion that Clonazepam was detected in Forero's urine sample; (2) Lykissa's testimony independently established the presence of another drug common in drug-facilitated sexual assaults in Forero's hair sample; and (3) the State presented other overwhelming testimony and evidence tending to prove defendant's guilt.

¶ 55 Defendant presented eight witnesses and thirteen exhibits to support his claim that he and Forero had a romantic relationship and had engaged in consensual sexual activity short of intercourse. In response to the overwhelming evidence of Forero's incapacitation, defendant suggested that Forero may have had a virus, but then conceded that he "did not [know] at the time." Defendant's evidence did not address Montminy's finding of vaginal injuries consistent with penetration from a penis, did not undermine Dr. Lykissa's forensic report, and did not provide an alternative explanation as to why Forero might have had Cyclobenzaprine in her system when she was not taking any medications at the time.

¶ 56 To be clear, defendant, like all criminal defendants, enjoyed a presumption of

innocence until proven guilty by the State beyond a reasonable doubt, and therefore was not required to put forth any testimony or evidence whatsoever. Likewise, the burden of demonstrating a lack of prejudice beyond a reasonable doubt upon a constitutional error lies with the State, and defendant was not required to affirmatively demonstrate prejudice on this issue. But the State's voluminous and comprehensive evidence of defendant's guilt amply satisfies its burden.

As shown through its verdict, this evidence persuaded the jury beyond a reasonable doubt that defendant committed the second-degree forcible rape and first-degree kidnapping of Forero on 4 January 2017. Although the assumedly erroneous Lewallen testimony confirmed the presence of Clonazepam in Forero's urine sample and emphasized the potential "synergistic effects" of the combination of Clonazepam and Cyclobenzaprine, its admission does not require a new trial, in light of the overwhelming nature of the remaining evidence. Accordingly, we modify and affirm the holding of the Court of Appeals finding no prejudicial error on this issue.

**B. Rule 404(b): Evidence of Prior Bad Acts**

Second, we consider defendant's Rule 404(b) claim.

> When the trial court has made findings of fact and conclusions of law to support its 404(b) ruling, . . . we look to whether the evidence supports the findings and whether the findings support the conclusions. We review de novo the legal conclusion that the evidence is, or is not, within the coverage of Rule 404(b).

*State v. Beckelheimer*, 366 N.C. 127, 130 (2012).

Rule 404(b) of the North Carolina Rules of Evidence establishes that:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake, entrapment or accident.

N.C.G.S. § 8C-1, Rule 404(b) (2021).

Generally, Rule 404 acts as a gatekeeper against "character evidence": evidence of a defendant's character—as illustrated through either direct testimony or evidence of prior bad acts—admitted "for the purpose of proving that he acted in conformity therewith on a particular occasion." N.C.G.S. § 8C-1, Rule 404(a). It has long been observed that character evidence "is objectionable not because it has no appreciable probative value but because it has too much. The natural and inevitable tendency of the tribunal—whether judge or jury—is to give excessive weight to the vicious record of crime thus exhibited and either to allow it to bear too strongly on the present charge or to take the proof of it as justifying a condemnation, irrespective of the accused's guilt of the present charge." John Henry Wigmore, *Evidence* § 58.2 (Peter Tillers ed. 1983). Accordingly, Rule 404(b) evidence "should be carefully scrutinized in order to adequately safeguard against the improper introduction of character evidence against the accused." *State v. Al-Bayyinah*, 356 N.C. 150, 154 (2002).

This important protective role notwithstanding, this Court has repeatedly held

that "Rule 404(b) state[s] a clear general rule of *inclusion.*" *State v. Coffey*, 326 N.C. 268, 278–79 (1990); *see Al-Bayyinah*, 356 N.C. at 153–54 (quoting *Coffey* for this same proposition). That is, relevant evidence of past crimes, wrongs, or acts by a defendant are generally admissible for any one or more of the purposes enumerated in Rule 404(b)'s non-exhaustive list, "subject to but *one exception* requiring its exclusion if its *only* probative value is to show that the defendant has the propensity or disposition to commit an offense of the nature of the crime charged." *Coffey*, 326 N.C. at 279 (emphasis in original); *see Beckelheimer*, 366 N.C. at 130 (noting that "[Rule 404(b)'s] list 'is not exclusive, and such evidence is admissible as long as it is relevant to any fact or issue other than the defendant's propensity to commit the crime' " (quoting *State v. White*, 340 N.C. 264, 284 (1995))).

¶ 62      Rule 404(b) has particular salience in trials for sexual offenses. On the one hand, "this Court has been markedly liberal in admitting evidence of similar sex offenses by a defendant." *State v. Bagley*, 321 N.C. 201, 207 (1987) (quoting *State v. Cotton*, 318 N.C. 663, 666 (1987)). On the other hand, though, the high potency of prior sex offense testimony brings a correspondingly high risk of improper sway upon the jury's determination. *See State v. Gray*, 210 N.C. App. 493, 521 (2011) (noting that "[t]he improper admission of a prior sexual assault by a defendant tends to bolster an alleged victim's testimony that an assault occurred *and* that the defendant was the perpetrator, since such evidence informs the jury that the defendant has

committed sexual assault in the past."); *State v. McClain*, 240 N.C. 171, 174 (1954) (noting that "[p]roof that a defendant has been guilty of another crime equally heinous prompts to a ready acceptance and belief in the prosecution's theory that he is guilty of the crime charged. Its effect is to predispose the mind of the juror to believe the [defendant is] guilty, and thus effectually to strip him of the presumption of innocence.").

¶ 63        In order to navigate this terrain, this Court has looked toward the useful guidance of twin north stars: similarity and temporal proximity. *See Al-Bayyinah*, 356 N.C. at 154 ("To effectuate these important evidentiary safeguards, the rule of inclusion described in *Coffey* is constrained by the requirements of similarity and temporal proximity."). Regarding the first, prior acts are considered sufficiently similar under Rule 404(b) " 'if there are some unusual facts present in both crimes' that would indicate that the same person committed them." *Beckelheimer*, 366 N.C. at 131 (quoting *State v. Stager*, 329 N.C. 278, 304 (1991)). While these similarities must be specific enough to distinguish the acts from any generalized commission of the crime, "[w]e do not require that [they] 'rise to the level of the unique and bizarre." *Beckelheimer*, 366 N.C. at 131 (quoting *State v. Green*, 321 N.C. 594, 604, *cert. denied*, 488 U.S. 900 (1988)). Regarding the second, while a greater lapse in time between the prior and present acts generally indicate a weaker case for admissibility under Rule 404(b), *see, e.g., Jones*, 322 N.C. at 586, 591 (holding that admission of Rule 404(b)

testimony of a prior sexual assault that took place "some seven years before in much the same manner as the [allegations] in the case *sub judice*" was "prejudicial to the defendant's fundamental right to a fair trial on the charges for which he was indicted because the prior acts were too remote in time"), "remoteness for purposes of 404(b) must be considered in light of the specific facts of each case[,] . . . [and t]he purpose underlying the evidence also affects the analysis." *Beckelheimer*, 366 N.C. at 132 (cleaned up).

¶ 64 Finally, if an appellate court reviewing a trial court's Rule 404(b) ruling determines in accordance with these guiding principles that the admission of the Rule 404(b) testimony was erroneous, it must then determine whether that error was prejudicial. *See Scott*, 331 N.C. at 46 (engaging in prejudice analysis after finding Rule 404(b) error). In accordance with N.C.G.S. § 15A-1443(a), "[t]he test for prejudicial error is whether there is a reasonable possibility that, had the error not been committed, a different result would have been reached at trial." *Id*. "The burden of showing such prejudice . . . is upon the defendant." N.C.G.S. § 15A-1443(a). Notably, while for the reasons noted above there is a "high *potential* for prejudice inherent in the introduction of evidence of prior [sex] offenses," such evidence is not prejudicial per se. *Scott*, 331 N.C. at 46 (emphasis added).

¶ 65 Here, as in the Confrontation Clause analysis above, we assume without deciding that the Samonds and Weyersberg testimony was erroneously admitted

under Rule 404(b). However, because we conclude that this assumed error was not prejudicial, we modify and affirm the ruling Court of Appeals finding no prejudicial error on this issue.

¶ 66          In determining whether a Rule 404(b) error creates "a reasonable possibility that, had the error not been committed, a different result would have been reached at trial[,]" the burden of demonstrating prejudice lies with defendant. *Id.*; *see* N.C.G.S. § 15A-1443(a). Here, after careful consideration, we conclude that defendant has failed to demonstrate a reasonable possibility that the jury would have reached a different verdict if the Samonds and Weyersberg testimony had been excluded at trial.

¶ 67          In his arguments regarding Rule 404(b) prejudice, defendant asserted that "[t]here was not overwhelming evidence of [d]efendant's guilt." "Rather," defendant claimed, "this case boiled down to" a credibility contest: "the credibility of the prosecuting witness . . . versus the credibility of [d]efendant." "Given th[is] lack of overwhelming evidence and the central importance of the credibility of [d]efendant versus the credibility of [Forero]," defendant argued, "the erroneous admission of the prior bad acts evidence . . . was highly prejudicial."

¶ 68          We cannot agree. In a simple "credibility contest," there is little or no physical or corroborating evidence of the incident in question, leaving the competing stories of the two internal participants and whom to believe as the only real question for the

factfinder. In such an instance, any evidence of prior acts that tends to bolster or undermine the credibility of one of the primary participants may be particularly influential in the ultimate outcome. *See, e.g., Scott*, 331 N.C. at 46 (determining that the erroneous admission of testimony regarding a prior sexual assault allegation was prejudicial when the "[b]oth the State's evidence and the defendant's were corroborated to some extent by the testimony of other witnesses").

¶ 69        That is plainly not the case here. Although defendant and Forero did present two contrasting stories about the events of 4 January 2017, Forero's version of the events was then corroborated by extensive supporting external testimony and evidence. As discussed in more detail above, this corroborating evidence included: Camejo and Harold-Strod's testimony regarding Forero's apparent incapacitation; surveillance video footage demonstrating this incapacitation; Montminy's testimony regarding Forero's description of the alleged rape during the sexual assault examination; Montminy's testimony regarding Forero's vaginal injury consistent with penetration by a penis; subsequent DNA testing of the rape kit; Detective Helms's testimony regarding her interview with Forero and subsequent investigation; Lieutenant Pfister's testimony regarding his review of the evidence and investigation of the scene of the alleged crime; Detective Samples' testimony regarding the investigation process; and Dr. Lykissa's testimony regarding the presence of a drug common in drug-facilitated sexual assaults in Forero's hair sample,

among other testimony and evidence. We see this case not as simply a "credibility contest," but as one with overwhelming evidence of defendant's guilt.

¶ 70        It is within the context of this overwhelming evidence that we must consider the relative impact of the Samonds and Weyersberg testimony alleging past sexual assault. By the time Samonds and Weyersberg shared their allegations with the jury, Dr. Lykissa, Montminy, Camejo, Norquist, Detective Helms, Harold-Strod, and Lieutenant Pfister, among others, had already corroborated Forero's testimony, with additional supporting testimony to come later. Under these circumstances, we cannot conclude that a reasonable possibility exists that the jury would have reached a different verdict but for the assumedly erroneous admission of the Samonds and Weyersberg testimony. Accordingly, defendant has failed to meet his burden of showing prejudice, and we modify and affirm the holding of the Court of Appeals finding no prejudicial error on this issue.

## III.    Conclusion

¶ 71        Assuming without deciding that the trial court's admission of the Lewallen testimony violated defendant's rights under the Confrontation Clause and that the Samonds and Weyersberg testimony violated Rule 404(b) of North Carolina Rules of Evidence, we nevertheless conclude that these assumed errors were not prejudicial. Regarding the Lewallen testimony, the State has met its burden under N.C.G.S. § 15A-1443(b) of demonstrating that the assumed Confrontation Clause error was

harmless beyond a reasonable doubt. As for the Samonds and Weyersberg testimony, defendant has failed to meet his burden under N.C.G.S. § 15A-1443(a) of demonstrating that there is a reasonable possibility that had the assumed Rule 404(b) error not been committed, a different result would have been reached at trial. Accordingly, we modify and affirm the holding of the Court of Appeals finding no prejudicial error on these issues.

MODIFIED AND AFFIRMED.

Justice BERGER did not participate in the consideration or decision of this case.

Chief Justice NEWBY concurring.

I concur in the portion of the majority's opinion holding that defendant was not prejudiced by the alleged errors in this case. I do not, however, join the portions of the majority opinion that discuss defendant's arguments regarding the trial court's alleged error under the Confrontation Clause of the Sixth Amendment and N.C.G.S. § 8C–1, Rule 404(b). We have assumed without deciding that the trial court erred. Thus, discussion of the merits of these arguments is unnecessary. *Tr. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 242, 328 S.E.2d 274, 281 (1985). Accordingly, I concur.